OLD TOWN CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 81740.   Filed February 1, 1962.

*Karl W. Windhorst, Esq., Paul Farber, Esq., Carl J. Rubino, Esq., and Paul L. Franken, Esq.*, for the petitioner.

*Robert S. Bevan, Esq.*, and *Clarence Dunnaville, Jr., Esq.*, for the respondent.

FISHER, *Judge:* Respondent determined a deficiency in petitioner's income tax for the year 1953 in the amount of $52,000. The greater portion of the deficiency, and the only part here in issue, results from respondent's disallowance of $100,000 of a $117,128.78 business expense deduction in 1955, thereby decreasing the net operating loss for 1955 which could be carried back to 1953. The sole issue for our deter-

mination is whether the compromise settlement and legal fees paid or accrued by petitioner in 1955 in connection with a lawsuit against one of its employees are ordinary and necessary business expenses of petitioner.

### FINDINGS OF FACT.

Some of the facts and some evidence have been stipulated. The facts stipulated are found as such and are incorporated herein by reference.

The petitioner, Old Town Corporation, was incorporated about March 17, 1917, under the laws of the State of New York and maintained its principal place of business in Brooklyn, New York. Its principal business has been the manufacturing and selling of carbon papers, inked ribbons, duplicators, and duplicating supplies.

Petitioner has been listed since 1951 on the American Stock Exchange or its predecessor, the New York Curb Exchange.

James H. McGraw, Jr. (hereinafter referred to as McGraw), formerly the president, chairman of the board, and a principal stockholder of McGraw-Hill Publishing Company, severed all relationship with that company in April 1951. He then commenced an investigation of petitioner as a possible new business venture. In May 1952, McGraw engaged Stewart, Dougall and Associates, Inc., management consultants, to make a study and report of the operations of the petitioner. This report, submitted in August, was prepared under the supervision of Charles Roberts (hereinafter referred to as Roberts), who, at that time, was a senior associate of Stewart, Dougall and Associates, Inc. During the course of the preparation of the report, McGraw was in close contact and became well acquainted with Roberts.

As an additional preliminary step of investigation, McGraw engaged Borden Putnam (hereinafter referred to as Putnam), formerly treasurer of McGraw-Hill Publishing Company and then a partner of the accounting firm of J. K. Lasser & Co., to render a financial analysis of petitioner, which report was submitted to McGraw.

During the period from May through September 1952, McGraw and Roberts had discussions with respect to the former acquiring the majority of the voting stock of petitioner. It was understood between them that in order to obtain said majority, McGraw was negotiating for the 45.9 percent block of voting stock owned by the Eaton family. During these months, there were also discussions between McGraw and Roberts as to the employment of Roberts as president of petitioner, if and when McGraw should purchase a majority of the voting stock of petitioner.

At the time of these discussions concerning the possible future employment of Roberts by petitioner, he was cognizant of the fact that

McGraw was neither a shareholder, officer, nor director of petitioner. McGraw, however, advised Roberts that he would purchase the shares in petitioner only if he could assure himself that Roberts would accept employment by the petitioner for a substantial number of years.

After various discussions between Roberts and McGraw concerning the terms for the prospective employment by petitioner of Roberts, McGraw advised Roberts on November 7, 1952, that he was then confident he would purchase the majority of voting stock of petitioner in December 1952, and he advised Roberts to resign from his present employment to be available as soon as the purchase was consummated.

On November 9, 1952, Roberts wrote the following letter to McGraw:

CHARLES S. ROBERTS
*950 Soundview Drive*
*Mamaroneck, New York*

*November 9, 1952*

MR. JAMES McGRAW, JR.
*79 East 79th Street*
*New York, New York*
Dear Jay:

In accordance with our discussion on Friday, November 7, I am recording our agreement of the financial aspects relating to my employment by Old Town Corporation.

Base Salary: $50,000 per annum
Common Stock Option: 12,000 shares
Incentive Compensation Plan: agreement in principle
Pension Plan: as established

*Common Stock Option*

The Company will give me the option to buy 12,000 shares of its Common Stock at $10.50 a share or at the average market price of the stock during the 20 days following payment of the proposed Preferred Stock dividend, whichever is lower. I shall have the right to exercise this option to the extent of 1,200 shares at any time during each year of employment. The option shall be cumulative, i.e., stock not acquired under the option during any year or years shall continue to be available at any time during employment.

The option shall expire when employment terminates, but any balance of stock available under the cumulative provision above may be acquired at the option price within 90 days after termination of employment.

*Incentive Compensation Plan*

I propose for your consideration an incentive compensation plan containing the following two elements:

1. The Company would pay me 1% of the Net Income before taxes on that amount exceeding $1,200,000.
2. The Company would pay me 1% of Net Sales on that amount exceeding the Net Sales realized by the Company for the calendar year 1952.

I am looking forward to our association in building Old Town into a truly great and profitable company. I have taken all the steps necessary in order to be available on January 1.

Cordially yours,

(signed) Charles S. Roberts

McGraw, upon receiving the letter, inscribed the following notation upon the original: "Charley: This is fine with me but Sullivan & Cromwell or some other good legal firm should put this in shape."

Sullivan & Cromwell, referred to above, was general counsel to the petitioner.

McGraw also assured Roberts he was confident that any arrangements he made to attract people he thought should be in the company would be approved by the board of directors of petitioner when he controlled the majority of the stock in petitioner.

Subsequently, the terms set forth in the letter of November 9, 1952, were modified by Roberts and McGraw to eliminate the alternative stock option price, change the effect of termination of employment on the stock option, and provide for a company car to be supplied by the petitioner. Roberts deemed all negotiations to be for the prospective employment by petitioner rather than by McGraw.

During this time McGraw also had discussions with Putnam concerning the latter's possible employment by petitioner as vice president in charge of financial operation of the petitioner.

On December 22, 1952, a meeting was held at the office of the petitioner which was attended by McGraw, Roberts, Putnam, Eaton, Batchker, petitioner's president, and Schenker, attorney for McGraw. A further meeting was held on December 23, 1952, at the Links Club which was attended by the same men with the exception of Roberts and Schenker.

A report of both meetings was prepared by Putnam in letter form addressed to McGraw under date of December 24, 1952, which stated, in part, as follows:

The following matters were discussed at the December 22nd meeting:

(1) *Executive Organization of the Company:*

\* \* \* \* \* \* \*

As soon as Mr. McGraw, Jr., takes delivery of the stock he is purchasing from Mr. Eaton, et al, Mr. Charles S. Roberts is to be elected Executive Vice-President of the Company, and Mr. Putnam as Vice-President and Treasurer.

Mr. McGraw, Jr., agreed to the designation of Executive Vice-President for Mr. Roberts with the understanding that he would immediately assume full responsibility as the chief executive operating officer of the Company. It was further understood that at the stockholders' meeting on April 14th, Mr. Roberts will be elected President of the Company. At that time Mr. Batchker will become Vice Chairman of the Board.

The matter of title for Mr. McGraw, Jr., was left open with the understanding that, as majority stockholder, he will direct policy and assume top responsibility for the direction of the Company and its management.

(2) *Board of Directors:*

Until the stockholders' meeting Messrs. McGraw, Jr., Roberts and Putnam will be invited to attend all Directors' meetings.

Mr. Schenker stated that no changes can take place in the Board of Directors at this time. Accordingly, such changes will be deferred until the stockholders'

meeting, at which time Messrs. McGraw, Roberts and Putnam will be elected directors.

\*　　\*　　\*　　\*　　\*　　\*　　\*

(9) *Effective Date for Participation by Messrs. Roberts and Putnam:*

Mr. Roberts pointed out the strong desirability of indoctrination on our part at the earliest possible moment. Since there is a possibility that common stock will not actually be transferred until January 15th, he suggested that we should plan to spend approximately full time in the Company's offices beginning January 2, 1953. It is not anticipated that either Messrs. Roberts or Putnam would have any official responsibility or authority until the stock is actually transferred—that this interim period would be used for study and becoming generally acquainted with the mechanics of operations. Messrs. Eaton and Batchker expressed general agreement with this idea and we assume it will work out as suggested by Mr. Roberts.

(10) *Timetable:*

| | |
|---|---|
| December 30 | Stockholders' meeting. |
| December 30 | Immediately after the stockholders' meeting, assuming an affirmative vote on the new preferred issue, contracts will be executed between Mr. Eaton, et al and Mr. J. H. McGraw, Jr., and Mr. Eaton, et al, and the purchasers of the preferred stock, presumably Kidder, Peabody & Co. |
| January 2, 1953 | Or immediately thereafter, distribution of new preferred stock. |
| January 2 to January 15, 1953 | Transfer of common stock to J. H. McGraw, Jr. The actual date of transfer will be dependent on the sale date for the preferred stock. Mr. Eaton has been advised by counsel that he must sell his common and preferred stock at the same time. |
| January 13 | Regular meeting of the Board of Directors. |

The following matters were reviewed at the December 23rd meeting. Paragraph numbers below refer to paragraphs preceding.

\*　　\*　　\*　　\*　　\*　　\*　　\*

(9) It was agreed that Messrs. Roberts and Putnam should spend as much time as they see fit in the Company's office, starting January 2nd. Details to be worked out with Mr. Batchker.

Although Batchker and Eaton (who were both present at the above meetings) were at that time the controlling shareholders and were directors of petitioner, the meetings did not constitute a meeting of petitioner's board of directors.

On December 31, 1952, Roberts terminated his association with Stewart, Dougall and Associates, Inc., and between January 2 and 16, 1953, was in attendance at the offices of petitioner.

On February 2, 1953, a contract of sale was signed with respect to the sale to McGraw of a majority of the voting stock of petitioner and on February 10, 1953, the sale was effected. Later that same day, the board elected Roberts as executive vice president and Putnam as vice president and treasurer, each at a salary of $35,000 per annum.

On February 11, 1953, the following day, McGraw notified Batchker and Eaton that he had previously agreed with Roberts and Putnam on

a salary of $50,000 per annum and the use of a company car, and that the petitioner should honor this agreement. Batchker refused McGraw's request. McGraw replied that he would "recommend" such action to the new board after it had been established in April 1953. A few days later, McGraw wrote the following letter to Putnam:

JAMES H. McGRAW, JR.
*79 East 79th Street*
*New York*

*February 13, 1953*

MR. BORDEN R. PUTNAM
OLD TOWN CORPORATION
*750 Pacific Street*
*Brooklyn, New York*

Dear Mr. Putnam:

I understand from you that Mr. Batchker has taken the position which he states is on advice of Sullivan & Cromwell that he should not authorize the purchase of company cars for you and Mr. Roberts, and that he should not authorize the effective date for your salaries of January 1, 1953. I understand that your salaries will begin as of the day of your election, that is, February 10, 1953.

This will authorize you to draw checks on my personal account to pay for cars ordered by yourself and Mr. Roberts. You will both execute notes to me in order that I may be protected until April 14, when the new Board of Directors for Old Town Corporation will be elected. At that time I am quite confident the new Board will approve the purchase of the company cars and reimburse me, and will also make appropriate adjustments in the salaries for yourself and Mr. Roberts so that your full salaries for 1953 will be at the rate of $50,000 each.

Very truly yours,

(signed) James H. McGraw, Jr.

On March 27, 1953, Putnam, then treasurer of petitioner, in an initialed memorandum set out the terms of employment for Roberts which were to be included in a subsequent contract between Roberts and petitioner. The employment for a 3-year period was substantially upon the same terms as those originally agreed upon by Roberts and McGraw.

McGraw assured Roberts that he would recommend all the above-stated terms for employment to the board for approval at the following meeting.

The new board, now with 14 directors, contained 4 directors from the old 6-man board.

At the board meeting immediately following the stockholders meeting of April 14, 1953, Roberts was elected president of petitioner. A resolution was passed by the board in which Roberts' salary for the full year ending December 31, 1953, was fixed at $50,000. No other terms for the employment of Roberts, however, were established by the board.

On May 4, 1953, McGraw notified Roberts that Batchker, Eaton, Sharpe, and Putnam had threatened to leave the company because of

Roberts' management and suggested that Roberts resign as president of petitioner and return to his old employment.

On May 19, 1953, the board held a meeting to consider the status of Roberts' employment. The minutes of said meeting state, in part:

Mr. McGraw reported to the Board that a situation had developed concerning Mr. Charles S. Roberts, President of the Company. To summarize, Mr. McGraw reported that Mr. Roberts had been unable to establish a working basis with the rest of the Management of the Company and that in the best interest of the Company, Mr. McGraw had suggested to Mr. Roberts on May 4, 1953, that he should resign as President and Director of the Company. At the meeting with Mr. Roberts, the matter of any financial settlement in connection with the termination of his employment was not discussed but was left for subsequent consideration. It was understood that Mr. Roberts would seek to reestablish himself with Stewart, Dougall & Associates and then would give Mr. McGraw his idea of an appropriate settlement. However, before there was any further discussion, there was received a letter from Mr. Roberts' attorney who requested that our attorneys get in touch with him to discuss the matter. At this point, the matter was turned over to our counsel, Messrs. Sullivan and Cromwell. To date, there has been no agreement between the lawyers and we have not received a resignation from Mr. Roberts.

\*        \*        \*        \*        \*        \*        \*

After discussion, the Board decided that a Special Meeting of the Board of Directors should be held at 9:30 A.M. Monday morning, May 25, at the New York Office of the Company, 345 Madison Avenue, for the purpose of taking action to remove Mr. Roberts from the office of President of the Corporation. Mr. Putnam was directed to deliver and mail to Mr. Roberts a notice of the intended action. After the notice had been prepared, Mr. Putnam left the room and upon his return reported that the notice had been delivered to Mr. Roberts in the latter's office and had been mailed to him at his home.

\*        \*        \*        \*        \*        \*        \*

It was suggested that action be taken to provide for a settlement with Mr. Roberts if prior to the special meeting of the Board he should resign on acceptable terms. After discussion and on motion duly made, seconded and unanimously carried, it was voted that the resignation of Mr. Roberts as President, a Director and a member of the Executive Committee of the Company be accepted if forthcoming prior to his removal from the office of President, and that in the event of such resignation Mr. Putnam be authorized on behalf of the Company to cause to be paid to Mr. Roberts an amount not exceeding Mr. Roberts' salary for the balance of the calendar year and to execute and deliver to Mr. Roberts a release of all claims of the Company against him, all subject to the execution and delivery by Mr. Roberts of a release of all claims of his against the Company and each of the Directors of the Company individually.

In answer to this proposal, Roberts' attorney, Shepard, notified petitioner on May 21, 1953, that while Roberts would release the petitioner upon the payment of the balance of his salary, $31,250, he would not release any other claims against others associated with the corporation.

Roberts did not resign or accept any settlement. On May 25, 1953, the board held the special meeting referred to above. A resolution was

passed removing Roberts from the office of president, and McGraw was formally elected to fill that position. Roberts attended the meeting with another counsel, Bernays. Bernays asked whether the company's proposal to pay Roberts his salary to the end of the year ($31,250) had been conditioned on Roberts'. furnishing releases of his claims against the directors individually as well as against the corporation. Petitioner's attorney, Foshay, told him that, as was customary in matters of this kind, the proposal had been conditioned on the exchange of general release of all claims. Bernays then asked whether consideration had been given to effecting a settlement between Roberts and petitioner alone. Foshay replied that Roberts' other counsel, Shepard, had threatened legal action against petitioner, McGraw, and possibly other directors, and that, in his discussions with such counsel, it had been agreed that there was nothing in the situation which could not be disposed of through agreement on a monetary payment to Roberts, and that in the event of such agreement general releases of all claims would be exchanged. Foshay added that since Shepard demanded $75,000 and that petitioner offered only $30,000, further discussion had become futile.

Bernays then denied the validity of the removal proceedings as being without cause; stated that the board was not acting in good faith; and protested against the entire removal action of the board as being a device to force Roberts to resign and compel him to settle with the petitioner claims which he had against McGraw.

As of May 23, 1953 (2 days before the meeting at which Roberts was removed from office), none of the directors, except McGraw and possibly Putnam, whether on the new or the old board, were aware of the exact terms of employment discussed by Roberts and McGraw. McGraw had, however, informed the directors of discussions with Roberts concerning a salary of $50,000 and the use of a company car.

Petitioner paid to Roberts, prior to his removal from office, the sum of $18,752.05. The unpaid balance of his yearly salary of $50,000 for 1953 amounted to $31,250.

Not having reached any settlement of all the claims, Roberts instituted an action on June 25, 1953, in the Supreme Court of the State of New York against McGraw and the petitioner. The complaint stated four separate and distinct causes of action. The first three were asserted against McGraw personally on the grounds of fraud and breach of contract. The first count for fraud alleged that McGraw had fraudulently induced Roberts to sever his association with his previous employer with the assurance that McGraw would be able to employ Roberts on the agreed terms, that McGraw had never discussed the terms with the directors of petitioner, nor had McGraw ever attempted to recommend such terms to the board. The second and third counts, founded upon breach of contract, allege that

McGraw breached a contract with Roberts whereby he was to use his influence on the board of directors to cause Roberts to be employed by petitioner on the terms agreed to between them. The fourth action was against petitioner for wrongfully discharging Roberts and preventing him from performing his duties as president of petitioner. Roberts sought $500,000 in damages against McGraw and $31,250 in damages against petitioner. The latter amount represented the balance of his 1953 salary.

Roberts, McGraw, Putnam, and Batchker were examined under oath in extensive pretrial examinations of the Roberts action covering over 2,800 pages of transcript. It was not filed, however, with the Supreme Court of New York.

Both defendants were represented by Sullivan & Cromwell, general counsel for petitioner.

On March 9, 1954, McGraw wrote a letter to the petitioner in which he stated, in part:

It is my view that all my activities with respect to the Roberts matter were for the Corporation and in the corporate interest.

Accordingly, this letter will serve to advise you that I reserve the right to claim reimbursement from you for any liability which I might incur in the * * * [Roberts] action.

The above letter was brought to the attention of the board of directors at its meeting held March 15, 1954. The substance of the Roberts action, together with McGraw's position relative to reimbursement, was reported to the petitioner's stockholders in the corporate financial statements of 1953 and 1954, and to the Securities and Exchange Commission in the 1954 report.

A special board of directors meeting was held on October 7, 1955. Prior to said meeting, a memorandum relating to a proposal for settlement of the Roberts action which had been prepared by Sullivan & Cromwell was mailed to each of the directors. The memorandum stated in part:

The Special Meeting of the Board of Directors is called for the purpose of submitting to the Board a proposal for the settlement of an action now pending in the Supreme Court of the State of New York, County of New York, entitled *Charles S. Roberts* v. *James H. McGraw, Jr. and Old Town Corporation*. In this action, commenced in June 1953, Roberts, who was Executive Vice President of this corporation from February 10, 1953 to April 14, 1953 and was both a director and President of this corporation from April 14, 1953 until May 25, 1953, sued both this corporation and James H. McGraw, Jr., (a) claiming as against the corporation that he had been discharged without cause and was entitled to recover his salary for the balance of the calendar year 1953 in the amount of $31,250, and (b) claiming as against Mr. McGraw that he was entitled to damages of $500,000 based on (i) his loss of his employment with Stewart, Dougall & Associates, Inc. (where he was earning $20,000 a year), (ii) on his loss of a prospective five-year employment contract at $50,000 a year with this corporation, which he alleged Mr. McGraw had agreed

to recommend to the Board of Directors of Old Town and to advocate, and (iii) on his loss of business reputation. The case has been actively litigated for over two years and a great deal of testimony has been taken on both sides in preparation for trial. The corporation's general counsel, Sullivan & Cromwell, have appeared in the action both on behalf of the corporation and of Mr. McGraw. The Board has been advised generally of the progress of the litigation from time to time.

Before the publication of the annual report of the corporation for the year 1953, Mr. McGraw advised the corporation that, as he had testified under oath in his pre-trial examination, he had never agreed with Roberts to recommend or advocate his employment by Old Town for a five-year term or any other definitive period; that all of Mr. McGraw's activities with respect to the Roberts matter from their inception had been performed exclusively in the interest of the corporation and were completely unrelated in any way to Mr. McGraw's personal affairs; that to the extent that he participated as a director and as Chairman of the Executive Committee in the dismissal of Roberts, Mr. McGraw acted solely in what he and the Board of Directors considered the best interest of the corporation notwithstanding that he was aware, as was the Board of Directors, that if he participated in that action he would be exposed personally to a suit by Roberts. Mr. McGraw by letter to the corporation dated March 9, 1954 formally advised the corporation that he reserved the right to claim reimbursement from the corporation for any liability which he might incur in the suit. (A copy of Mr. McGraw's letter is attached.)

The corporation has been informed that Mr. McGraw's personal legal advisers, Messrs. Schenker & Schenker, have expressed to him the opinion that, on the basis of the evidence elicited in the course of the pre-trial depositions in *Roberts* v. *McGraw* and the other facts known to them, his claim for indemnification against the corporation is a meritorious one.

Mr. McGraw has advised that he will not compromise the litigation with his personal funds, but will insist that the action be tried and the issue of his liability be determined without waiver of his right to present a claim for reimbursement against the corporation if it is determined that he is liable to Roberts to any extent.

The corporation has taken no action with respect to Mr. McGraw's claim for indemnification in the Roberts matter, except to disclose the making of the claim in its report on Form 8–K to the Securities and Exchange Commission and in the "Notes to Financial Statements" contained in the annual reports to stockholders for the years 1953 and 1954.

The corporation's general counsel have advised that Mr. McGraw's claim for reimbursement against the corporation should be regarded as having substance. Without attempting at this time to predict the outcome of an assertion of such claim, they advise further that it would not, in their opinion, constitute waste or mismanagement but would be a valid and lawful exercise of their powers for the Board of Directors of the corporation as a matter of business judgment to effect a settlement of the action, including the claims against Mr. McGraw, out of its own funds. They point out that such a settlement would eliminate the risk that the corporation's possible liability to Mr. McGraw on his claim for reimbursement would be measured by the amount of a possible jury verdict against Mr. McGraw greatly exceeding the portion of the settlement amount that could be considered applicable to the settlement of Roberts' claims against Mr. McGraw. They point out further that settlement will save further legal expense and the time and effort of senior officers of the company, avoid public litigation of a personnel matter, and avert possible future controversy and incident expense in connection with any claim of Mr. McGraw for reimbursement.

Counsel have advised further that if the Roberts action were tried, there could be no guaranty that the defense would succeed, that the fact that the dismissal of Roberts was evidently required in the best interest of the corporation would not constitute a defense to Roberts' claims in and of itself and that, while the outcome of a trial could be regarded as uncertain, nevertheless there was a risk of a judgment in favor of Roberts and against the corporation directly in an amount not exceeding $31,250 plus interest and against Mr. McGraw personally in a substantially greater amount.

A settlement of the action has been negotiated and is recommended by the management and by the corporation's general counsel, subject to the approval of the Board, * * *

The board of directors at the above meeting voted to adopt counsel's recommendation for settlement upon the following terms:

1. The petitioner to pay $80,000 to Roberts.

2. Roberts to discontinue the lawsuit and give general releases running in favor of petitioner and its officers and directors, including McGraw.

3. McGraw to release the corporation of any claim for reimbursement with respect to the Roberts action.

4. Petitioner to discharge the total expense of defending the action.

An agreement effecting settlement on the above-agreed terms was executed by the interested parties on October 11, 1955.

The minutes of the special meeting of the board were approved by the regular board meeting held on October 20, 1955. The directors present at this meeting were D. E. Broggi, president of Neptune Motor Company; G. A. Rentschler, chairman of the board of directors of Baldwin-Lima-Hamilton Co.; W. F. Rockwell, chairman of the boards of directors of Rockwell Manufacturing Company and Rockwell Spring & Axle Co.; H. E. Talbott, president of H. E. Talbott & Company; H. A. May, senior vice president of Westinghouse Air Brake Co.; E. L. Tabat, vice president of petitioner, and B. R. Putnam, vice president and treasurer of petitioner.

The petitioner in settlement of the Roberts action either paid or accrued in 1955 on its corporate books the following items aggregating $117,128.78:

| Amount of payment | Year of payment | Payee | Description |
|---|---|---|---|
| $80,000.00 | 1955–1956 | Roberts | Settlement of all claims. |
| 30,000.00 | 1956 | Sullivan & Cromwell | Legal fees for defending all claims. |
| 5,000.00 | 1956 | Carl J. Rubino | Opinion rendered to petitioner in Roberts action. |
| 746.74 | 1955 | }Sullivan & Cromwell | {Reimbursement of expenses concerning all claims. |
| 208.29 | 1956 | | |
| 1,173.75 | 1955 | H. B. Sansom | Cost of transcript for pretrial examination. |

The petitioner files its Federal income tax returns and maintains its books on an accrual method of accounting. Its returns for the calendar years 1953 and 1955 were filed with the director of internal revenue for the district of Brooklyn, New York.

Petitioner, on its Federal income tax return for the calendar year 1955, claimed a deduction in the amount of $117,128.78 for "settlement of litigation plus related expenses" and reported a net operating loss in the amount of $218,581.40.

On May 1, 1956, the petitioner filed an Application for Tentative Carryback Adjustment (Form 1139) requesting a refund of income tax paid for the calendar year 1953 by reason of the net operating loss reported for 1955. Pursuant to said application, in August 1956 petitioner received a refund of income tax in the amount of $113,662.33.

Subsequently respondent disallowed $100,000 of the claimed deduction of $117,128.78 in 1955 on the ground that the amount did not constitute an ordinary and necessary expense of the petitioner in carrying on any trade or business under section 162(a) of the 1954 Code, thereby reducing the net operating loss carryback to 1953 and creating a deficiency for the year 1953.

OPINION.

The Roberts suit contained four separate causes of action—one against petitioner for breach of contract, and three against McGraw for fraud and breach of contract. Petitioner and McGraw were not codefendants in any one cause of action. Nevertheless, McGraw notified petitioner that, inasmuch as the transactions which resulted in the causes of action against him were undertaken for the benefit of petitioner, he would seek reimbursement from petitioner in the event he was held personally liable to Roberts. Petitioner, therefore, was confronted with a direct claim by Roberts and a contingent claim by McGraw. Petitioner compromised the claims against itself and McGraw, paid all legal expenses attendant thereto, and deducted the total amount of $117,128.78 as an ordinary and necessary business expense. From this amount, respondent disallowed $100,000, determining that such amount was attributable to the claims against McGraw and was not an ordinary and necessary business expense of petitioner under section 162(a) of the Code of 1954.[1]

The record does not disclose the portion of the attorneys' fees and compromise payment which was directly attributable to the claims against McGraw. In the absence of evidence to the contrary, we cannot say respondent's determination that $100,000 was so attributable was clearly erroneous or arbitrarily established. The sole issue before us, then, is whether the amount expended by petitioner in connection with the actions against McGraw constituted an ordinary and necessary business expense of petitioner. Petitioner

[1] SEC. 162. TRADE OR BUSINESS EXPENSE.

(a) IN GENERAL.—There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, * * *

marshals a formidable array of authorities as advancing its cause; respondent counters with an equally impressive display of decisions in support of his position. But these cases, and the many others discovered by us in independent research, fail to prove "any verbal formula that will supply a ready touchstone." *Welch* v. *Helvering*, 290 U.S. 111, 115 (1933). "Review of the many decided cases is of little aid since each turns on its special facts." *Deputy* v. *DuPont*, 308 U.S. 488, 496 (1940).

Thus, unfettered, we proceed to determine the question in this case on its own special facts, taking advantage of whatever help we may find in the decided cases. We are bound to give to the words "ordinary and necessary" their usual, ordinary, and everyday connotation, without reference to "some esoteric concept derived from subtle and theoretic analysis." *Old Colony R. Co.* v. *Commissioner*, 284 U.S. 552 (1932).

Was the expenditure in issue necessary?

In the usual situation where a taxpayer compromises a legal claim of an adverse party and incurs legal expenses in connection with it, the courts are slow to override petitioner's judgment as to the necessity of incurring the expenses. *Lilly* v. *Commissioner*, 343 U.S. 90 (1952). This is based upon the logical assumption that a taxpayer, when dealing with an adverse party, will not incur expenses unless they are actually required or reasonably justified by the needs of the business.

On the other hand, there is the situation when a taxpayer, such as an employer, compromises and pays the legal expenses of a claim against one of its employees without any liability on the employer's part or any business motive involved. In such cases, the employer-taxpayer will generally be held not to have incurred a necessary business expense. This is based upon the view that without obligation or business purpose, the expense could not have been necessary. See *Blackwell Oil & Gas Co.*, 20 B.T.A. 661 (1930), affd. 60 F. 2d 257 (C.A. 10, 1932); *Edwards & Son* v. *United States*, 255 F. 2d 407 (C.A. 2, 1958).

The present situation, having elements of both the aforementioned situations, is more difficult. It is not, as petitioner contends, merely a compromise of a potential claim which we may safely infer that petitioner would not have paid unless necessary, inasmuch as petitioner and McGraw were not in all respects adverse parties and other considerations may have been involved. On the other hand it is not, as respondent contends, a mere voluntary payment of expenses for an employee inasmuch as there is the element of liability and business motive on petitioner's part. The entire transaction, therefore, must be carefully scrutinized.

As an aid in ascertaining whether the expenses were "necessary" within the meaning of the Code in a situation such as presented here, three tests have been enumerated in *Levitt & Sons, Inc.* v. *Nunan*, 142 F. 2d 795, 798 (C.A. 2, 1944), remanding on other grounds a Memorandum Opinion of this Court.

The first test is whether petitioner was entirely confident that any suit which McGraw would institute would not succeed. Obviously, if such confidence existed, it would indicate that petitioner did not deem the compromise to be a necessary business expense. The record discloses, however, that at no time did petitioner ever possess such confidence regarding McGraw's potential claim. On the contrary, petitioner had always taken McGraw's claim seriously and had not cast it off as a sham. The acknowledgment of the possible liability to McGraw was disclosed in its report to the Securities and Exchange Commission and in its annual reports to stockholders for the years 1953 and 1954. Petitioner, seeking to ascertain the validity of McGraw's potential claim, sought the advice of its counsel, Sullivan & Cromwell, who had been familiar with all the facts of the case. Counsel advised petitioner that McGraw's potential claim had merit and substance. In the light of counsel's opinion it would hardly be reasonable to expect laymen to retain confidence concerning the ability of petitioner to successfully defend any suit instituted by McGraw.

The second test is whether the payments in question were made for the purpose of avoiding the damages or liability which might have resulted from a suit by McGraw.

While respondent states he is not urging that petitioner acted fraudulently or in bad faith, he contends the main intent of petitioner was to benefit McGraw. Petitioner contends, however, that while McGraw was ostensibly benefited, the reason for compromising the claim for McGraw was to avoid a possible cause of action by McGraw in the event he was held liable personally to Roberts.

Without the benefit of being able to search into the minds of the members of the board of directors who voted for the compromise on behalf of petitioner, we can only analyze the facts surrounding the adoption in ascertaining their intent.

The most significant evidence of the intent of the board members at the time of the adoption of the compromise settlement in issue is their reliance on the memorandum which was prepared by petitioner's attorneys, Sullivan & Cromwell, and presented to the board members at that meeting. This memorandum strongly recommended the compromise of the claims against McGraw by petitioner as being in the best interests of petitioner in that it would preclude exposing petitioner to possible greater liability, legal fees, and damage to its reputation.

The exact terms of compromise recommended by counsel were adopted in toto, clearly indicating the reliance of the board upon counsel's recommendation.

The compromise of the claims against McGraw by petitioner undoubtedly was beneficial to him. It may well be that he encouraged petitioner to compromise the claim. We, however, may not infer that petitioner would act solely to accommodate McGraw, particularly since the directors would be accountable to shareholders for corporate waste or mismanagement if they caused corporate funds to be used for private purposes.

The majority of the members of the board who were present at the special meeting when the compromise was adopted and the general meeting when it was approved were not closely related to petitioner or McGraw, but held important positions in other unrelated businesses. We are satisfied from the record before us that the board of directors acted substantially upon the recommendation of counsel in voting for the compromise as being in the best interests of petitioner. We do not agree with respondent's contention that the members of the board were completely under the influence of McGraw or that they, as experienced businessmen, would knowingly expose themselves to personal liability to shareholders for corporate waste.

We conclude, therefore, that the intent of the board of directors in compromising the claim on behalf of McGraw was to protect petitioner from a possible lawsuit and the exposure to liability, added legal fees, and damages to its reputation. Petitioner, with this intent, deemed the expenses to be necessary.

The third test, and possibly the most important, is whether the belief held by petitioner concerning the validity of McGraw's claim was justified so far that a reasonable person in its place would have thought that the settlement for McGraw would be necessary. This test transcends the belief or intent of petitioner and determines whether it was reasonable under the circumstances for petitioner to deem the expenditure in issue to be necessary .

It should be noted that one of the tests of determining necessity is not, as respondent contends, whether petitioner was in fact liable to reimburse McGraw but whether petitioner was justified in believing there existed sufficient exposure to liability in order to justify believing that the compromise was necessary. We know of no requirement that there must be a legal obligation to make an expenditure before it can qualify as a necessary business expense. *Waring Products Corporation* , 27 T.C. 921, 929 (1957). Business, like everything else, can only be conducted upon prophecies, and prophecies are hardly infallible. *Levitt & Sons, Inc.* v. *Nunan, supra* at 798.

A compromise payment may be necessary albeit there is doubt con-

cerning the ultimate liability to pay. The applicable principle was expressed in *Laurence M. Marks*, 27 T.C. 464 (1956), where we said (p. 467):

An analysis of the entire record convinces us that the payment in question was an ordinary and necessary expense of petitioner's trade or business as an investment banker and director, within the intendment of section 23(a) of the Internal Revenue Code of 1939. Although the stipulation characterized the payment as having been made "voluntarily," it can neither be properly characterized as gratuitous, nor as personal to petitioner in the nature of an expense to protect his personal reputation. There was a serious question as to whether he was in fact liable under section 16(b) of the Securities Exchange Act of 1934. At the time the payment was made it was by no means clear that Shamrock could not have recovered the amount paid had it attempted to litigate the matter. The payment was in satisfaction of a bona fide possible cause of action, arising out of petitioner's trade or business, and was by no means "voluntary" in the sense of being gratuitous or without a valuable consideration.

While we see that a compromise may be reasonable when there is doubt concerning liability, we have present here the added factor as to whether petitioner was justified in believing that there existed any exposure to liability. Respondent alleges, in effect, that it was unreasonable for petitioner to even register any doubt concerning its liability to McGraw. He also states that the fact petitioner acted in good faith and thought that McGraw's claim had substance, and even the fact that petitioner acted upon the advice of counsel, is wholly irrelevant and immaterial. We cannot agree.

The members of the board of directors were men of wide business knowledge. Nevertheless, the matter of liability of petitioner to McGraw was too highly technical for laymen to analyze. It is reasonable and ordinary for members of a board of directors in a situation such as this to rely upon the advice of their attorneys who are familiar with the law as well as the facts in the case. We cannot say that counsel's opinion was so baseless or erroneous that it was unreasonable for the directors to have relied upon it. Nor can we say from the record before us that counsel's opinion as to the substance of McGraw's claim was erroneous. The potential suit between McGraw and petitioner is not before us to be decided and we do not have all the facts before us. Pretrial examination of the parties concerning the transaction in issue resulted in excess of 2,800 pages of disputed testimony. The burden is not upon this Court to determine petitioner's liability to McGraw nor to predict the outcome of the New York courts. A taxpayer, acting in good faith with the intention of compromising a potential claim which he reasonably believes has substance, should not be denied a business deduction even if the facts finally indicate that it was unnecessary to pay the settlement. Here we cannot say with any degree of certainty that the expenditure did not help petitioner for we cannot, from the record before us, hold that there was no possibility of

the New York courts holding petitioner liable to McGraw for reimbursement.

Petitioner acted reasonably and was justified in relying upon the advice of its counsel in determining that the expenditure in issue was a necessary one. See *John W. Clark*, 30 T.C. 1330 (1958); *C. Ludwig Baumann & Co. v. Marcelle*, 203 F. 2d 459 (C.A. 2, 1953). We conclude that the payment of the compromise and legal expenses on behalf of McGraw was a necessary expense to petitioner's trade or business. Cf. *Catholic News Publishing Co.*, 10 T.C. 73 (1948).

We are satisfied also that the expenses were ordinary. As stated in *Welch* v. *Helvering*, 290 U.S. 111, 114 (1933):

Ordinary in this context does not mean that the payments must be habitual or nominal in the sense that the same taxpayer will have to make them often. A lawsuit affecting the safety of a business may happen once in a lifetime. The counsel fees may be so heavy that repetition is unlikely. Nonetheless, the expense is an ordinary one because we know from experience that payments for such a purpose, whether the amount is large or small, are the common and accepted means of defense against attack.

The fact that the suit against McGraw sounded mostly in fraud does not make the expense any less ordinary. *Commissioner* v. *Heininger*, 320 U.S. 467, 472 (1943).

After McGraw notified petitioner of his intention to seek reimbursement from petitioner in the event that he was found liable to Roberts, petitioner sought the advice of its attorney who recommended a settlement of McGraw claims on the ground that petitioner, if it failed to do so, would be exposed to greater liability, added legal fees, and damage to its reputation. The claims were settled in good faith for a fraction of the amount for which petitioner might have been held liable. We hold the expenditures in issue to have been an "ordinary and necessary" business expense within the meaning of section 162(a) of the Code of 1954 and hence fully deductible.

*Decision will be entered under Rule 50.*