T.C. Memo. 2010-4

UNITED STATES TAX COURT

PETER D. AND KAREN M. CAVARETTA, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 24823-07.                    Filed January 5, 2010.

<u>Jeffrey A. Human</u>, for petitioners.

<u>Kevin M. Murphy</u>, for respondent.

MEMORANDUM OPINION

HOLMES, <u>Judge</u>:  While working for her husband's dentistry
practice, Karen Cavaretta billed insurance companies for work he
hadn't done.  After she pled guilty to fraud charges, he repaid
the money and deducted the repayments as business expenses.  The
Commissioner agrees that the repayments are deductible, but

argues that they were restitution, not business expenses.  He also says the Cavarettas were negligent in taking a contrary view.

## Background

Peter Cavaretta opened his dental practice in 1970, and ever since his wife Karen has kept the books and handled the billing. The practice served clients of several insurance companies, including Group Health, Inc. (GHI).  Peter treated GHI patients at agreed rates and then billed GHI, which would send him a check.  If he overbilled GHI, the contract required him to repay the difference.[1]  If the practice didn't pay, GHI could simply deduct the amount owed from future reimbursement checks.

In 1995, Karen Cavaretta began billing GHI for "planing and scaling," a procedure that Peter never performed.  She continued submitting these false claims until January 2001, when a postal inspector put a stop to it.  He also extracted a statement from Karen admitting to the false claims.  Both parties agree that Peter was unaware of his wife's enterprise.  They also agree that

---

[1] The Commissioner makes much of the fact that the only GHI contract in the trial record is one from November 2000, toward the end of Karen's improper billing scheme.  Peter credibly testified that he had to sign an agreement with GHI before he began seeing its clients, and that most insurance company agreements included similar obligations to refund overpayments. He also credibly testified that he had earlier contracts with GHI, and we specifically find that he had a contract with GHI during the years in question and that it required him to repay overcharges.

the overcharges went into the practice's books as revenue--which the Cavarettas duly reported to their accountant, who included it on their tax returns.

Once GHI learned of the false claims, it started asking for repayment. GHI sent a letter in March 2001 to "Dr. Cavaretta", with the subject line "Peter Cavaretta, DDS," the name of the practice. The letter demanded repayment of more than $1.1 million. A later letter, addressed to Karen's defense lawyer but with the same subject line, increased the demand to over $1.6 million. But GHI then backed down from what may have been its own inflated estimates of the damage it had suffered, and finally agreed that Karen had submitted $544,216 in false claims that needed to be repaid.

Karen pled guilty to one count of health-care fraud in August 2001. United States District Judge Elfvin sentenced her to 18 months in prison, with two years of supervised release afterward. He ordered a $100 assessment as required under the federal sentencing guidelines, but ordered no fine or restitution.

Judge Elfvin attached to the sentencing judgment a letter from Karen's attorney saying that she would pay GHI $600,000 to "settle all civil claims against the Cavarettas, * * * and specifically those claims arising from matters dealt with in the criminal action brought in the Western District of New York."

The letter provided that the first payment of $230,000 would be paid through Karen's lawyer, and the rest would go directly to GHI.  In return, GHI wrote a letter supporting a home-confinement sentence.

In December 2001, Karen's lawyer sent a cashier's check for $230,000 to GHI.  He included a letter reading, "Due to the unusual fashion by which Ms. Cavaretta was sentenced, I was instructed by the probation officer to transmit this directly to [GHI]."  The Commissioner and the Cavarettas stipulated that Peter made the payment, as well as payments of $165,833 in 2002 and $55,322 in 2003.[2]

Peter deducted these payments as business expenses of the dentistry practice on his Schedule C.[3]  These deductions

---

[2] Although the Commissioner stipulated that Peter made the payments, he continued to jaw on this point; he claims that the lawyer's sending the check, when combined with the lack of evidence that the Cavarettas kept separate checking accounts, must mean that Peter was merely transmitting payments owed by Karen.  But the Commissioner signed the stipulation saying "Dr. Peter D. Cavaretta made payments to GHI . . .," and Tax Court rules are clear that "[a] stipulation shall be treated, to the extent of its terms, as a conclusive admission," and says those admissions will be binding.  Rule 91(e).  We may allow changes when justice requires, id., but the Commissioner has not asked for a change.  And we also find that the weight of the evidence presented is not contrary to the stipulation.  (Even if the payments were made from a joint bank account, it would not change our holding for reasons explained later.)  (Unless otherwise indicated, all Rule references are to the Tax Court's Rules of Practice and Procedure, and all section references are to the Internal Revenue Code in effect for the years in issue.)

[3] According to Schedule C of the tax return the 2003 payment
(continued...)

generated net operating losses carried back to 1996, 1997, and 1998, for which the Cavarettas got tentative refunds. Sec. 6411(a). But the Commissioner changed his mind after auditing the Cavarettas' returns and sent them a notice of deficiency for all three years.

The parties ask us to decide if Peter's payments were deductible as loss carrybacks and, if not, whether the deficiencies resulting from their disallowance should be subject to accuracy-related penalties. At the time they filed their petition, the Cavarettas lived in western New York.

## Discussion

We have jurisdiction to hear this case because section 6213(b)(3) lets the Commissioner rescind a tentative refund by, among other means, a notice of deficiency, which allows a taxpayer to petition Tax Court, or a math-error notice, which does not. See <u>Ron Lykins, Inc. v. Commissioner</u>, 133 T.C. ___ (2009). The Commissioner chose to send the Cavarettas a notice of deficiency. We can reevaluate the Cavarettas' treatment of the payments in 2001-03 even though the notice of deficiency doesn't cover those years because section 6214(b) gives us jurisdiction to review other years or periods "as may be

---

[3](...continued)
was only $50,000, and the additional $5,322 was for uncontested business expenses, including telephone, dues and subscriptions, and outside services. The discrepancy has no effect on the amount of the carryback.

necessary correctly to redetermine the amount of such deficiency."

This case is unusual in that both parties agree that the payments were deductible. The Cavarettas say the payments were deductible under section 162 as a business expense, or under section 165(c)(1) as a loss incurred in a trade or business, or under section 1341 as a payment made under a claim of right. The Commissioner argues instead that the Cavarettas can deduct them only under section 165(c)(2), as losses incurred in a transaction (i.e. fraud) entered into for profit.

Lurking behind this dispute is the general rule that a taxpayer usually can't have negative income--if he suffers a very large loss in one year, he may be limited to reporting zero income. But section 172 allows taxpayers to sometimes claim a net-operating-loss (NOL) carryback. Taxpayers with a big NOL in one year may be able to report zero income in that year and use the remaining loss to offset other years' income, possibly even getting refunds of taxes already paid. But not all losses can be carried back. Section 172(d) says that most nonbusiness deductions, like those under section 165(c)(2), can be used only to reduce income that isn't from a trade or business and only in the year incurred--they cannot be carried back. Sec. 172(b)(2), (d)(4).

So our job is to decide whether the Cavarettas' payments were business or nonbusiness expenses. The parties frame the question as asking whether the payments were meant to settle GHI's potential contract claim against Peter or to comply with the criminal plea agreement with Karen.

The Commissioner very much wants us to find that the payments were Karen's, that they were "restitution", and that she made them as part of her plea deal. We do agree, and find as a matter of fact, that the payments were restitution. Most of the documents in the record refer to the payments as restitution, including the settlement agreement between GHI and the Cavarettas, the letter from Karen's defense attorney to GHI attached to Judge Elfvin's sentencing judgment, and the sentencing judgment itself, which refers to the letter as "the civil restitution agreement."

The Commissioner thinks that's enough to win. He argues that Stephens v. Commissioner, 905 F.2d 667 (2d Cir. 1990), revg. 93 T.C. 108 (1989), makes payments labeled "restitution" never deductible under section 162 and only sometimes deductible under section 165. We think this is too blunt a reading of Stephens, and that labeling a payment "restitution" does not make it automatically ineligible for deduction as a business expense.[4]

---

[4] Consider Spitz v. United States, 432 F. Supp. 148 (E.D. Wis. 1977), in which the taxpayer was convicted of theft by a contractor and ordered to pay $5,000 in restitution. The court found that the restitution was not a fine or penalty made

(continued...)

The salient facts in <u>Stephens</u> are simple: Stephens had criminally defrauded Raytheon, and part of his sentence was suspended on condition that he pay $1 million in restitution. He had also been sued by Raytheon, and settled in part by agreeing that Raytheon could empty his Bermuda bank account holding $530,000 to partially satisfy the restitution order. Stephens then tried to deduct that payment.

When <u>Stephens</u> was in our Court, we asked whether that payment--sort of a cost of stealing from Stephens's perspective--was deductible under either section 162 or 165. We first noted that restitution, "such as is involved herein," wasn't an ordinary and necessary business expense and could be deducted only under section 165, if at all. <u>Stephens</u>, 93 T.C. at 111 (citing <u>Mannette v. Commissioner</u>, 69 T.C. 990, 992-94 (1978)). We then held, for public-policy reasons, that the payment was not even deductible as a loss resulting from a transaction entered into for profit under section 165(c)(2). <u>Id.</u>

The Second Circuit reversed, but it didn't hold that all restitution is automatically deductible or nondeductible. It carefully distinguished punitive from compensatory restitution, even in criminal cases, and reasoned that Stephens' restitution

_____

⁴(...continued)
nondeductible by section 162(f), because it was "an amount due and owing", and there was no public policy against allowing the deduction. <u>Id.</u> at 149-50.

payment had both law-enforcement [punitive] and compensatory purposes, but that it was "primarily a remedial measure to compensate another party." Stephens, 905 F.2d at 672. The court held that it was more compensatory than punitive because the sentencing judge had stressed "'that Raytheon must get its money back,'" and added the suspended jail sentence to ensure that Stephens paid. Id. at 673. The court held it important that the sentence included jail time, a fine, *and* restitution, so that the restitution was compensatory while the jail time and fine were punitive. Id. at 674. It distinguished Bailey v. Commissioner, 756 F.2d 44 (6th Cir. 1985), in which a taxpayer tried to deduct payments made to satisfy a restitution order that had previously been a fine. Stephens, 905 F.2d at 674. It therefore held that it would not be against public policy to allow deductions for this type of restitution. Id.

It also touched--albeit lightly--on the issue of whether restitution payments could be business expenses under section 162. On the facts in Stephens, this might have been dicta, because Stephens and the Commissioner agreed that the deductibility of the restitution was governed by section 165. Id. at 670. The Second Circuit nevertheless quoted with approval the part of our opinion where we held that "a restitution payment, such as is involved herein, is not an 'ordinary and necessary' business expense as required by section 162(a) but

rather gives rise to a loss in a 'transaction entered into for profit' under section 165(c)(2)." Id. The Commissioner urges us to elide the phrase "such as is involved herein," and read Stephens as a general bar on deduction of restitution payments as business expenses.

We decline to do so. The restitution in Stephens and Mannette was for criminal fraud or embezzlement without any connection to a separate business, where the taxpayer seeking the deduction was also the wrongdoer. (In Mannette, the taxpayer tried to convince the Court that embezzlement was an integral part of an alleged securities business. Mannette, 69 T.C. at 993.) This is hardly the case here.

In this case, the Cavarettas are very much disagreeing with the Commissioner about whether the restitution payments are deductible under section 162. On the assumption that some restitution payments are nondeductible under that section,[5] we first ask whether the restitution here was punitive. If it was, the deduction may be barred; if it wasn't, then we will need to ask whether it is an otherwise ordinary and necessary expense of

---

[5] We held in Waldman v. Commissioner, 88 T.C. 1384, 1389 (1987), affd. 850 F.2d 611 (9th Cir. 1988), that the exclusion from deductibility of fines and penalties under section 162(f) sometimes bars restitution paid to private parties. The Second Circuit questioned this in Stephens, 905 F.2d at 674, but we haven't revisited Waldman, and need not do so here--we'll just assume that punitive restitution is nondeductible under section 162.

Peter's dentistry business.  But we do agree at the outset with the Cavarettas' claim that <u>Stephens</u> doesn't say all restitution is nondeductible.

On the question of whether the restitution here is punitive, <u>Stephens</u> is controlling.  Its logic makes the Cavarettas' case for deductibility even stronger than Stephens's, because it isn't at all clear that the restitution here was part of Karen's *criminal* sentence.  Judge Elfvin's only specific mention of restitution was on the page titled "Special Conditions of Supervision," where he noted, "The defendant shall comply with the *civil* restitution agreement . . . ."  (Emphasis added.) In the criminal sentencing paperwork, Judge Elfvin noted a "None" in the line marked "total amount of restitution" and on the page entitled "Criminal Monetary Penalties" the Restitution column contains a zero.

But even if we swallowed the Commissioner's argument, and assumed Judge Elfvin had somehow bollixed the distinction between criminal and civil restitution, the Cavarettas' obligation to pay restitution was in addition to the sentencing of Karen to prison and supervised release.  <u>Stephens</u> says this fact weighs in favor of finding that the restitution--even if part of a criminal sentence--was compensatory, not punitive.

The amount of the restitution also suggests that it was meant to make GHI whole, and not meant to punish--the payments

totaled $600,000 on a claim worth $550,000.  But the claim had accrued over six years, and would have given rise to at least $50,000 in interest, meaning that the amount of the payments closely approximates (or even underestimates) what GHI was owed.

So we have little trouble concluding that the payments are noncriminal, compensatory restitution.  But are they business expenses, deductible under section 162?  On this question, the Commissioner pokes around for another argument, and contends that the payments can't be business expenses because they were expenses of committing fraud, and Dr. Cavaretta's business is dentistry, not fraud.  The Cavarettas brush this argument aside. They first contend that the payments were ordinary and necessary for Peter as a dentist.  The Cavarettas are clearly right that the payments settled a contract claim.  And payments in settlement of a contract claim usually qualify as ordinary and necessary business expenses under section 162.  Old Town Corp. v. Commissioner, 37 T.C. 845 (1962).  This is true even when no litigation has commenced, as long as the business felt the claim had some possibility of success, made the payments to avoid the damages or liability, and had an objectively reasonable belief that the expense was necessary.  See id. at 858-59.  Peter credibly testified that he would have lost his business if he had not settled the matter with GHI.  We also believed him when he said that the installment agreement he worked out with GHI was

less onerous than a potential court-ordered lump-sum payment. We therefore find that the payments were ordinary and necessary to his business.

This was not an ordinary contract claim, of course, but one that arose specifically because of Karen's wrongdoing. And even if we ignored Peter's contractual obligation to repay GHI, we would again agree with the Cavarettas that the payments were deductible--businesses can sometimes deduct payments made to satisfy claims against a third party. See, e.g., Lohrke v. Commissioner, 48 T.C. 679 (1967). Lohrke and similiar cases are usually about expenses that "originated with another person and would have been deductible by that person if payment had been made by him." Id. at 685 (citing nine other cases). And Karen could not have deducted these as business expenses herself, because (as the Commissioner is right to emphasize) taxpayers who procure illegal income can't claim they were in the trade or business of fraud or embezzlement, and Karen doesn't have another business to attribute the payments to. See Mannette, 69 T.C. at 992. ("Embezzlers generally have been prohibited from carrying back losses arising from repayments of embezzled funds.")

From Peter's perspective, though, the situation is a lot like the one that we saw in Musgrave v. Commissioner, T.C. Memo. 1997-19, where a business repaid a client after one of its employees had embezzled money from him. We held that the

repayment was an ordinary and necessary expense of the business. We stressed that deductibility depends on the relation of the payment to the business claiming the deduction; in other words, don't look at the situation from the perspective of the embezzling employee, but from that of the business actually claiming the deduction and see if there is a reasonable business purpose for repayment. The Commissioner tries to distinguish Musgrave as arising only from a civil liability, not criminal restitution. But as we've already explained, that only helps the Cavarettas, because Judge Elfvin ordered no criminal restitution --he just required the Cavarettas to abide by the civil restitution agreement they had negotiated privately with GHI.

The Commissioner next suggests that the payments aren't deductible because they were Karen's alone. We, however, find that both Cavarettas were obliged to make them. The first letters from GHI demanding refunds were addressed to Peter at his place of business, even though Karen had by then admitted to the scheme. The letter attached to the sentencing judgment stated that the payments were to "settle all civil claims against *the Cavarettas*." (Emphasis added.) And when GHI issued its final release of claims, it released "Karen Cavaretta and Dr. Peter Cavaretta, jointly and severally." Peter credibly testified that he viewed the term "restitution" to mean "paying back money that was overpaid to me."

A potentially more important difference between <u>Musgrave</u> and the Cavarettas' case, however, is that the business taxpayer in <u>Musgrave</u> was not filing a joint return with the misbehaving employee. This strikes a nerve with the Commissioner, who bristles at seeming to give Karen a tax benefit. And we agree with him that Karen could probably not get carryback-generating deductions if she were filing by herself. But the Supreme Court has said, "The deductions to which either spouse would be entitled would be taken, in the case of a joint return, from the aggregate gross income." <u>Helvering v. Janney</u>, 311 U.S. 189, 191 (1940). We have interpreted this to mean that one spouse may take a deduction on the joint return even if the other spouse would be prohibited from taking the same deduction. <u>DeBoer v. Commissioner</u>, 16 T.C. 662 (1951) (loss on sale to wife's grandson deductible by husband, despite prohibition on recognition of losses to family members, because husband not himself related to grandson),[6] affd. 194 F.2d 289 (2d Cir. 1952). So even though Karen could not deduct the payments as business expenses on the Cavarettas' joint return, we hold that Peter is not similarly barred. And the Cavarettas were right to combine their deductions to calculate their NOL. Sec. 1.172-3(d), Income Tax Regs. ("In the case of a husband and wife, the joint net

---

[6] The statute covering joint returns at issue in these cases has been repealed, and joint returns are now covered in section 6013(d)(3).

operating loss for any taxable year for which a joint return is filed is to be computed on the basis of the combined income and deductions of both spouses").

The Commissioner's final salvo is that the Cavarettas would somehow get a double deduction if we allowed a carryback. It is true that the Cavarettas offset business expenses against illegal income in those years, but sections 172 and 6411 governing NOL carrybacks are unconcerned with the source of income in the year of the carryback.

That leaves only the penalty that the Commissioner asserts for the Cavarettas' alleged negligence.[7] While this obviously disappears with the part of the deficiencies that we hold does not exist, we do specifically find that, even if we're wrong on the substantive issue of characterizing the payments as deductible business expenses, the facts of this case are so unusual and their legal treatment so uncertain that we would not find the Cavarettas to be negligent for taking the position they did.

The Commissioner is, however, asserting the negligence penalty against more than the payments we've just discussed. He also rejected some Schedule C and E deductions for 2001 and 2002

---

[7] We don't need to analyze the Cavarettas' other arguments that these payments might be deductible under section 1341, the claim-of-right deduction; or that any deduction not prohibited under section 162(f) should be allowed under section 165(c)(1).

unrelated to those payments, which also affect the amount of the NOL available for a carryback. The Cavarettas don't contest these adjustments, worth $39,282. They also presented no evidence or argument that these smaller disallowed deductions shouldn't be subjected to the accuracy-related penalty. We therefore sustain the Commissioner's determination of a penalty on any deficiency owed due to their disallowance.[8]

Decision will be entered under Rule 155.

---

[8] We point out for the parties' Rule 155 computations (and so we don't end up back here to redetermine interest in a section 7481 proceeding) that the Commissioner calculated interest on the deficiencies starting when the original returns were due (e.g., in April 1997 for the 1996 return), rather than in the years the returns claiming carrybacks were filed. Section 6601(d) says a carryback will not affect the computation of interest for any period before the net operating loss arises, and section 301.6601-1(e)(3), Proced. & Admin. Regs., provides when a carryback gives rise to an overpayment, interest runs from the last day of the year in which the loss arose. The parties may wish to consider whether interest should be calculated from the last day of each year in which Peter made a payment.