*Decision will be entered under Rule 50.*

JOSEPH P. PIKE, MARY RITA PIKE, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 3892-63. Filed September 10, 1965.

*William G. Hume*, for the petitioners.
*Ferd J. Lotz*, for the respondent.

FORRESTER, *Judge:* Respondent has determined deficiencies in income taxes and additions to tax against petitioners as follows:

| Year | Income tax | Addition to tax, sec. 6654, I.R.C. 1954 |
|---|---|---|
| 1957 | $4,132.08 | $22.75 |
| 1958 | 2,752.03 | |

The issues which remain to be decided are (1) whether income received by petitioner Joseph P. Pike in 1957 with respect to the sale of certain shares of Cardinal Life Insurance Co. stock was properly reported as long-term capital gain; (2) whether petitioners are entitled to a deduction for 1958 on account of the payment by Joseph P. Pike to Cardinal Life Insurance Co. of an amount equal to the 1957 income from the sale of that company's stock; and (3) whether petitioners are entitled to relief under section 1341 [1] on account of the 1958 payment to Cardinal Life Insurance Co. Petitioners have abandoned their claim that respondent improperly determined an addition to tax for 1957 under section 6654. Certain adjustments proposed in the statutory notice of deficiency have not been contested.

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

Petitioners, husband and wife, residing in Jeffersontown, Ky., filed their joint Federal income tax returns for 1957 and 1958 with the district director of internal revenue, Louisville, Ky. Joseph P. Pike will hereinafter be referred to as petitioner.

From about 1950 to 1957 or 1958, petitioner practiced law in Kentucky as an associate in the firm of Hensley & Logan. Sometime prior to February 1955, a client of the firm decided to organize a life insurance company. One of the partners became interested in the project as a possible future source of business for the firm. This partner acquired a stock interest in the new company. Petitioner was given an opportunity to subscribe to some stock, and he agreed to purchase 40 shares of voting preferred stock.

Cardinal Life Insurance Co. (hereinafter referred to as Cardinal) was incorporated under the laws of the Commonwealth of Kentucky

---

[1] Unless otherwise stated, all statutory references are to the Internal Revenue Code of 1954 as applicable during the taxable years.

on February 15, 1955. Cardinal had an authorized capital of $1 million, consisting of 50,000 shares of $10 par value preferred stock, each having the right to one vote per share, and 50,000 shares of $10 par value nonvoting common stock. On March 22, 1955, the board of directors accepted subscriptions for the initial issue of preferred stock and authorized a public offering of 20,000 shares of common stock. On March 25, 1955, Cardinal was licensed as a securities dealer by the Division of Securities, Department of Banking of the Commonwealth of Kentucky (hereinafter referred to as the division of securities). At that time, Cardinal registered with the division 20,000 shares of nonvoting common stock to be sold at $25 per share and 1,000 shares of voting preferred stock to be sold at the same price. The maximum commission in connection with the sale of each issue was set at 15 percent.

During the course of the public offering of common stock, the board of directors, on September 2, 1955, authorized the issuance to the preferred shareholders of options to purchase the remaining 30,000 shares of common stock. The option price was $25 per share, the same price at which the common stock was being sold in the public offering. Cardinal commenced business on February 14, 1956.

On March 27, 1956, at a meeting of the stockholders of Cardinal, contracts in lieu of the previous options were granted for the purchase of the 30,000 shares of common stock. Provision was made to increase the number of shares provided for in the option without any increase in the total purchase price in the event a 5-for-1 stock split then under consideration was approved. On March 28, 1956, contracts were issued for the purchase of 29,400 shares of common stock at $25 per share by the following preferred stockholders:

| Name | Number of shares of voting preferred stock owned | Number of shares granted by contract |
|---|---|---|
| Asbury Aldridge | 50 | 1,500 |
| John M. Hennessy | 40 | 1,200 |
| Clarence Kirchdorfer | 20 | 600 |
| Robert B. Hensley | 100 | 3,000 |
| J. Heber Lewis | 20 | 600 |
| John C. C. Mayo | 20 | 600 |
| Carl J. Narz | 20 | 600 |
| Joseph P. Pike | 40 | 1,200 |
| Mack Walters | 20 | 600 |
| Leo Weil | 20 | 600 |
| S. H. Goebel | 100 | 3,000 |
| C. C. Bales | 510 | 15,300 |
| Frank Bassham | 20 | 600 |
| Total | 980 | 29,400 |

Petitioner executed his contract on September 26, 1956.

Each contract contained the following material provisions: [2]

[2] The omitted paragraphs contained provisions relating to the rights of the contract holder in the event of a stock split, stock dividend, or offering of rights to subscribe to common stock.

# 790

WHEREAS, _____, a stockholder of this corporation, being the owner of _____ shares of preferred stock; and

WHEREAS, it is the judgement of this Board that the interest of this corporation will be advanced by entering into the contract for the purchase from this corporation, _____ shares of its non-voting common capital stock at the time, or times, at the price and on the terms as hereinafter set out in this resolution; and

WHEREAS, this B ard [sic] is empowered to enter into such an agreement and to dispose of the shares contracted by the said stockholder; and said shares are available for the purpose; and

WHEREAS, the stockholder devoted his time and energy to the promotion and organization of this corporation without remuneration, and that his influence emanating from his sphere of prominence, engendered good will to this corporation, and the execution of this Contract will inculcate the continued faith and confidnece [sic] of his following and will further serve as a notivation [sic] for the success of this corporation, and as an incentive toward the continued and successful administration of his duties in his service to the corporation, whether or not he, at any time, may hold office or become entitled to a salary or other fixed compensation;

Now, THEREFORE, be it

RESOLVED, that this agreement made and entered into this —— day of ————, 1956, by and between the CARDINAL LIFE INSURANCE COMPANY, a Kentucky corporation, hereinafter called the Company, and _____, hereinafter called the Stockholder,

The Stockholder does hereby agree to pay $_____ to the Company on or before the 2nd day of September, 1965, in consideration of the Company issuing to him _____ shares of its $10.00 par non-voting common capital stock.

*The Stockholder shall have a right at any time to demand the Company to issue any or all of the shares contracted for*, and the Company agrees to issue to the Stockholder all or any of the shares, provided the Company shall issue only the number of shares represented by the payment from the Stockholder which shall be equivalent to $25.00 for each share issued to the Stockholder, and *provided further, that the Stockholder, upon the exercise of his rights provided for in this Contract, shall present to the company, at its transfer agency in the City of Louisville State of Kentucky, this Contract accompanied by payment in cash.*

Upon the exercise of the right the Stockholder shall be entitled to receive one or more certificates for fully paid and nonassessable common stock of the par value of $10.00 for *the number of shares as determined by the election of the Stockholder* as herein provided.

\*        \*        \*        \*        \*        \*        \*

If on or before the expiration date of this contract, the Company shall offer any shares of common stock of any class for subscription by the common stockholders at a price less than this Contract price, the Stockholder, and to the extent that the rights provided for in this Contract are unexercised or *unexpired*, will become entitled to subscribe for purchase at the same price per share at which such stock is offered to the holders of the common stock to the number of shares of such common stock for which he would have been entitled to subscribe if he had been the holder of record of the number of shares of common stock then called for by this Contract and the Stockholder shall be given the same opportunity to exercise such subscription rights as the holders of the common stock, *and further, that all shares of common stock issuable upon the*

*exercise by the Stockholder of rights provided for in this Contract shall be issued as of the date on which the Contract is presented, and his right to purchase as provided by the terms of this instrument, and payment in full of the purchase price is made to the Company, and upon the exercise of such Contract right, the Stockholder shall become entitled as of such date to all dividends, subscriptions and other rights of a holder of record of such shares of common stock.*

The Company shall

(a) at all times authorize and reserve unissued a number of shares of the common stock sufficient to satisfy the rights as vested in the Stockholder to purchase stock as provided for in this Contract and keep supplied with sufficient stock certificates to provide for the exercise of such rights to purchase as provided to the Stockholder in this Contract; and

(b) not pay any dividend on its common stock unless such dividend is paid in cash or in common stock or in both.

In the event of death of the Stockholder, prior to the Stockholder's exercising his discretion in the payment and purchase of all the stock under the terms and conditions as provided herein, this Contract shall be binding and in full force and effect upon his heirs, executors, administrators and assigns.

All payments made under the terms of this Contract shall be payable to the chief executive officer at its principal place of business in Louisville, Kentucky.

This Contract contains all the terms and conditions between the Stockholder and the Company.

CARDINAL LIFE INSURANCE COMPANY

By _____

S. H. GOEBEL, President

_____

Stockholder

[Emphasis supplied.]

On April 25, 1956, the division of securities received notice from Cardinal that on March 27, 1956, its board of directors, by resolution duly adopted, had authorized the issuance of 30,000 shares of its presently authorized but unissued nonvoting common stock, par value $10, to be sold or distributed entirely among its own stockholders or their assignees, that no remuneration was to be paid either directly or indirectly in connection with the sale or distribution of such stock, and that this plan did not require the company to register its stock with the division of securities under Kentucky statutes.

At a meeting of Cardinal stockholders held May 31, 1956, Cardinal nonvoting common stock was split 5 for 1, each old common share being exchanged for 5 new common shares. On November 27, 1956, one James T. Gordon purchased the remaining 20 shares of the original issue of voting preferred stock and received a contract providing for the right to purchase 3,000 shares of new nonvoting common stock on the same basis as the original preferred stockholders. By December 31, 1956, contracts to purchase the entire additional issue of 30,000 shares of Cardinal nonvoting common stock (increased to 150,000 shares by virtue of the stock split of May 31, 1956) had been accepted as follows:

| Name | Number of shares of voting preferred stock owned | Number of shares granted by contract |
|---|---|---|
| D. A. Aldridge | 50 | 7,500 |
| John M. Hennessy | 40 | 6,000 |
| Robert B. Hensley | 100 | 15,000 |
| Joseph P. Pike | 40 | 6,000 |
| Clarence Kirchdorfer | 20 | 3,000 |
| J. Heber Lewis | 20 | 3,000 |
| John C. C. Mayo | 20 | 3,000 |
| Carl Narz | 20 | 3,000 |
| Mack Walters | 20 | 3,000 |
| Leo Weil | 20 | 3,000 |
| S. H. Goebel | 100 | 15,000 |
| C. C. Bales | 510 | 76,500 |
| Frank Bassham | 20 | 3,000 |
| James T. Gordon | 20 | 3,000 |
| Total | 1,000 | 150,000 |

The above group of persons will hereinafter be referred to as the contract-holders.

On or about January 15, 1957, the contract-holders collectively borrowed the sum of $30,000 from Foundation Life Insurance Service Co. of Atlanta, Ga., to use as operating capital for a nominee fund. Each contract-holder executed a promissory note to Foundation Life Insurance Service Co. in a face amount which bore the same ratio to the $30,000 borrowed as the contract-holder's allocable share of the contract stock bore to the total number of shares of contract stock. During the period from April 23, 1957, to December 16, 1957, the nominee fund, known as Frank A. Logan, Nominee, purchased 5,920 shares of stock from the following sources:

| Source | | Number of shares |
|---|---|---|
| Purchases from members of the stock purchase contract group | | 1,120 |
| Purchases from persons known to be close to members of the stock purchase contract group | | 800 |
| Purchases of stock issued in the name of stock brokerage firms: | | |
| Stock acquired from members of group | 605 | |
| Stock acquired from close associates of group | 1,100 | |
| Stock acquired from other brokerage houses | 300 | |
| Stock acquired from others | 315 | |
| | | 2,320 |
| Purchases from other stockholders | | 1,680 |
| Total | | 5,920 |

There were also deposited with the nominee fund an additional 400 shares of Cardinal common stock from Frank Bassham, Carl Narz, C. H. Kirchdorfer, and C. C. Bales, each of whom contributed 100 shares.

The nominee disposed of the 6,320 shares of stock as follows:

| Sales to the public: | Shares |
|---|---|
| Purchased by Buckley Enterprises and subsequently resold to the public | 2,000 |
| Sold to the public through Buckley Enterprises as agent for "Nominee" | 500 |
| Sold to the public by "Nominee" | 975 |
| Total | 3,475 |
| Redistributed to members of contract purchase group | 2,845 |
| Total | 6,320 |

Cardinal was fairly successful in writing insurance, and by the spring of 1957 it had some $12 million of insurance in force. Because the first year's costs of putting insurance on the books usually exceeded the first year's premium income, Cardinal had need for additional surplus. It had been anticipated that such need would arise if Cardinal was successful. To secure the needed surplus for the company, and also to secure a greater number of public shareholders throughout the Commonwealth of Kentucky,[3] the contract-holders agreed that up to one-half the contract stock could be sold to the public.

On May 27, 1957, Cardinal entered into a contract with Buckley Enterprises, a registered security dealer licensed by the division of securities, for the sale or distribution of 74,500 shares of Cardinal nonvoting common stock to be made available by the contract-holders. The contract provided that the stock should be sold in the various counties of Kentucky according to a specified numerical allocation.

When stock was sold under the foregoing arrangement, the purchaser would first pay Buckley Enterprises the price of the stock. Then $5 per share, representing the price of the stock to the contract-holder, would be remitted to Cardinal, which would issue the stock directly to the purchaser. Finally, the balance of the purchase price, less Buckley Enterprises' commission of 15 percent of the sales proceeds, would be paid to the contract-holder.

On June 4, 1957, petitioner executed an authorization to Cardinal to sell up to one-half his contract stock under the above-described arrangement. It was agreed that the shares sold under the plan would be allocated among the contract-holders in proportion to the number of contract shares reserved to each. From June 1, 1957, through March 24, 1958, pursuant to the aforementioned contract, Buckley Enterprises sold to members of the public 71,001 shares of Cardinal nonvoting common stock at prices ranging from $12 to $13.25 per share. These transactions may be summarized as follows:

[3] It was to Cardinal's advantage to have a large number of shareholders in the territory in which it was doing business, since such shareholders are excellent prospects for the sale of the company's insurance.

| | |
|---|---|
| Number of shares sold | 71, 001 |
| Number of purchasers involved | 860 |
| Gross amount collected by Buckley Enterprises | $891, 343. 25 |
| 15-percent commission to Buckley Enterprises | 133, 813. 54 |
| $5 per share to Cardinal | 355, 005. 00 |
| Distributed to contract-holders | 402, 524. 71 |

Under the sales arrangement with Buckley Enterprises, petitioner realized, during the taxable year 1957, gains or profits from the sale of stock in the amount of $20,287.24.[4]

In 1958, during a routine investigation of Cardinal by the Kentucky Department of Insurance, the facts concerning the sale of the contract stock were brought to the attention of C. P. Thurman (hereinafter referred to as Thurman), who then was commissioner of insurance. Thurman had doubts concerning the propriety of the transaction. Because a number of prominent Kentuckians were involved in the sale, Thurman requested the Governor to appoint special counsel to assist in the investigation. Thurman recommended Leo T. Wolford (hereinafter referred to as Wolford), a highly reputable lawyer without political involvements, for the position of special counsel. The Governor approved the appointment of Wolford, who thereafter advised Thurman concerning the implications of the sale of contract stock.

Wolford eventually became convinced that the entire net proceeds from the sale of the contract stock, and not merely the $5 per share contract price, properly belonged to Cardinal. Although he believed that the contract-holders had acted in good faith, Wolford was of the opinion that the money should be paid to the corporation. Thurman agreed with Wolford that a claim for the return of the profits to Cardinal should be pressed against the contract-holders, most, if not all, of whom were also directors of Cardinal.

A series of meetings followed, some or all of which were attended by the following persons: the contract-holders; their representative, one E. Smyth Gambrill of Atlanta, Ga.; Thurman; Wolford; Jo M. Ferguson, then the attorney general of Kentucky; and Earl V. Powell, an assistant attorney general. The contract-holders ultimately agreed to pay over to the corporation all their profits from the sale of the contract stock, and this was done during 1958. In December 1958 petitioner paid Cardinal the sum of $20,287.24, representing his profit from the sale of contract stock. No suit had been brought against petitioner by Cardinal or any of its shareholders for the return of such profit. There was no judicial determination that the profit belonged to the corporation.

---

[4] The $20,287.24 figure was stipulated by the parties. There is no explanation in the record for the discrepancy between the stipulated amount and the $19,653.49 reported on petitioner's 1957 return as the profit from the sale of Cardinal stock.

In addition to their demand that the contract-holders pay to Cardinal all the profits from the sale of the contract stock, the regulatory authorities had other complaints concerning the operations of Cardinal. Thurman, the commissioner of insurance, objected to Cardinal's practice of allocating a portion of its funds for the benefit of a particular group of policyholders. Cardinal was required to abandon this policy, so that all funds would be available for the benefit of all policyholders. Thurman also felt that it was improper for Cardinal to have its original books kept in Georgia. He felt that the Kentucky statutes required such books to be kept and the bookkeeping services performed in Kentucky. Furthermore, he believed Cardinal was needlessly paying an Atlanta firm to perform bookkeeping services in Georgia and to provide a duplicate set of books for Kentucky, since using a local bookkeeping service would eliminate the expense of two sets of books.

The department of insurance was not contending that any crime had been committed. The attorney general's office, however, claimed that the contract stock had not been properly registered under the Kentucky Securities Act, and that the criminal provisions of the statute had been violated. In Kentucky, the attorney general is not empowered to initiate criminal prosecutions in cases of this nature. The matter was brought to the attention of the Commonwealth's attorney for Jefferson County, so that he might decide whether to initiate proceedings. The contract-holders were not promised immunity from prosecution for paying Cardinal the profits from the sale of the contract stock. No criminal prosecution against petitioner was instituted as a result of his involvement in the sale of Cardinal contract stock.

When Cardinal was first organized, petitioner was neither a director, an officer, nor an employee of the corporation. In his capacity as an associate with the law firm of Hensley & Logan, he did some of the paperwork involved in the organization of Cardinal. Subsequently, petitioner was elected a director of Cardinal and, as a convenience to the corporation, was made an assistant secretary. Until it was dissolved in 1957 or 1958, the firm of Hensley & Logan represented Cardinal. After the dissolution of the firm, petitioner remained with Logan, who was employed as counsel for Cardinal.

Around the time of the investigation into the affairs of Cardinal, petitioner handled legal matters before the department of insurance on behalf of a number of clients. About the same time, petitioner was presented the opportunity to be an executive officer of a successful young insurance company; and subsequent to his payment to Cardinal of the profits from the sale of contract stock, petitioner did in fact become secretary-treasurer of such company. Petitioner believed that any continued controversy over the sale of Cardinal contract

stock or any litigation resulting from such controversy would damage his status and his reputation with the insurance industry. Petitioner was not entirely convinced that the profits legally belonged to Cardinal. However, petitioner realized the possibility that, when the attorney general's office and a prominent attorney like Wolford were contesting his position, his view of the law might have been erroneous. Rather than allow further controversy to endanger his professional career, petitioner decided to pay over his profit to Cardinal. Petitioner thereafter continued to engage in the private practice of law and to work for life insurance companies.

On his income tax return for 1957, petitioner reported his profit from the sale of Cardinal contract stock as long-term capital gain. On his 1958 return, petitioner deducted the payment to Cardinal as a business expense. In the statutory notice of deficiency, respondent determined that the amount received by petitioner upon the sale of Cardinal stock was profit from the "short" sale of the stock and hence was a short-term rather than long-term capital gain. Respondent determined in the alternative that such gain represented compensation from Cardinal for petitioner's efforts in promoting and organizing the company. Respondent also determined that no deduction was allowable in respect of the 1958 payment by petitioner to Cardinal.

### OPINION

Petitioner's primary contention is that he is entitled to the benefits of section 1341 as a result of his 1958 payment to Cardinal. Petitioner also contends that the 1957 gain from the sale of contract stock was properly reported as long-term capital gain.

As to the proper characterization of the profit realized by petitioner in 1957 from the sale of contract stock, we must consider the facts as they appeared at the end of 1957. Cf. *United States* v. *Lewis*, 340 U.S. 590 (1951). At that time, no claim had been made that the transaction should be treated as anything other than what it appeared to be. Each time Buckley Enterprises sold Cardinal stock on behalf of petitioner, the contract price of $5 per share was to be remitted to Cardinal and the excess of the purchase price over the contract price, less Buckley Enterprises' commission, remitted to petitioner. The remittance of $5 per share to Cardinal was obviously intended to constitute a purchase of the contract stock by petitioner, with the stock being issued directly to the purchaser as a convenience to all concerned.

Petitioner argues that his holding period for the contract stock began on September 26, 1956, the date on which he executed the stock purchase contract. Since no stock was sold by Buckley Enterprises prior to June 1, 1957, acceptance of petitioner's position would mean that petitioner had held the stock used to close the sales for longer than

6 months.  However, the contract expressly (if inartistically) provided that petitioner would acquire stockholder's rights in the contract stock only after he had made demand for the issuance of such shares and had paid Cardinal the contract price of $5 per share.[5] Inasmuch as payment of the contract price was not made until after the particular shares had been sold to the public purchaser by Buckley Enterprises, petitioner's holding period was merely transitory.[6]  Consequently, petitioner's gain from the sale of the contract stock was short-term capital gain.  Sec. 1222(1).

*Swenson* v. *Commissioner*, 309 F. 2d 672 (C.A. 8, 1962), reversing 37 T.C. 124 (1961), is distinguishable from the instant case.  The taxpayer in *Swenson* held a stock option under a contractual arrangement which provided, *inter alia*, that the taxpayer would have no rights in the stock until the certificates had been issued to him.  On January 10 the taxpayer notified the company of his intention to exercise the option, and on the same date paid the option price in full.  On January 14 the company acknowledged the receipt of the taxpayer's check, recorded the transaction on its books, and directed its transfer agent to issue the stock to the taxpayer.  The transfer agent issued the certificate to the taxpayer on January 16.  The stock was sold on July 16.  The Court of Appeals found that the provisions of the contract restricting the taxpayer's rights in the stock until issuance of the certificates were intended to protect the company against possible violations of stock exchange regulations and/or securities laws.  They were not intended to constitute a substantial limitation upon taxpayer's right to exercise his option.  The court held "that the taxpayer, by the exercise of his option in strict accordance with its terms and the payment of the full purchase price, acquired a substantial contractual interest in the stock prior to January 16."  309 F. 2d at 676.  Thus, the Court held that the taxpayer had sold the stock more than 6 months after he had acquired it.

During the year 1957, petitioner's rights in the contract stock were precisely analogous to those of an option-holder.[7]  Since petitioner did not prove that he had exercised his right to buy the contract stock more than 6 months before he disposed of the stock, the holding in *Swenson* cannot aid his cause.  It is well settled that the period during which an option is held will not be added to the holding period of property acquired under the option.  *Milliken* v. *Commissioner*, 196

---

[5] Compare *R. O'Brien & Co.* v. *United States,* an unreported case (D. Mass. 1956, 51 A.F.T.R. 1249, 56–1 U.S.T.C. par. 9261).  Cf. *Ethlyn L. Armstrong,* 6 T.C. 1166 (1946), affirmed per curiam 162 F. 2d 199 (C.A. 3, 1947).

[6] We need not decide whether the transactions involved herein technically constituted short sales of stock by petitioner.  See *Provost* v. *United States,* 269 U.S. 443 (1926).  Under sec. 1233(a) and sec. 1.1233–1(a), Income Tax Regs., petitioner's brief holding period would still require treatment of the gain as short-term capital gain.

[7] Petitioner's testimony that one purpose for granting the contracts was to enable Cardinal to call upon the contract-holders for the additional surplus it expected to need is contradicted by the terms of the contract, which gave Cardinal no such right.

F. 2d 135 (C.A. 2, 1952), affirming 15 T.C. 243 on this point; *D.C. Bothwell*, 27 B.T.A. 1351 (1933), affd. 77 F. 2d 35 (C.A. 10, 1935); I.T. 2447, VIII-1 C.B. 70. See also *E. T. Weir*, 10 T.C. 996 (1948), affirmed per curiam 173 F. 2d 222 (C.A. 3, 1949). The other cases relied upon by petitioner are readily distinguishable.

The parties have stipulated that petitioner's gain from the sale of Cardinal contract stock was realized on October 24, 1957. It is also stipulated that the sales by Buckley Enterprises were made between June 1, 1957, and March 24, 1958. As heretofore pointed out, petitioner did not acquire ownership of the contract stock before (but at the same time as) the shares were sold to the public. Even if the stipulations are treated as a concession by respondent that more than 6 months might have elapsed between petitioner's acquisition of the stock and his realization of the gain from the sale thereof, petitioner still cannot prevail. This is so because petitioner, upon whom rests the burden of proof, has not established that he acquired any or all of his contract stock more than 6 months prior to October 24, 1957; thus, the gain must be treated as short-term capital gain, as determined by respondent.[8]

We next consider petitioner's contention that he is entitled to relief under section 1341[9] on account of the payment to Cardinal in 1958 of his profits from the sale of contract stock. Respondent attacks this contention on two fronts: (1) Petitioner's payment to Cardinal is not deductible in 1958 because allowance of a deduction would frustrate sharply defined public policy and because the payment was personal in nature; (2) it was not "established" that petitioner was not entitled to retain the profits. As a corollary to his second approach, respondent contends that the payment was voluntary on the part of petitioner and for this reason not deductible. We will deal with respondent's contentions in the order indicated.

Respondent asserts two separate reasons why petitioner's 1958 pay-

---

[8] Respondent's alternative argument, that the gain represented compensation to petitioner for his efforts in promoting and organizing Cardinal, is refuted by the evidence.

[9] SEC. 1341. COMPUTATION OF TAX WHERE TAXPAYER RESTORES SUBSTANTIAL AMOUNT HELD UNDER CLAIM OF RIGHT.

(a) GENERAL RULE.—If—

(1) an item was included in gross income for a prior taxable year (or years) because it appeared that the taxpayer had an unrestricted right to such item;

(2) a deduction is allowable for the taxable year because it was established after the close of such prior taxable year (or years) that the taxpayer did not have an unrestricted right to such item or to a portion of such item; and

(3) the amount of such deduction exceeds $3,000,

then the tax imposed by this chapter for the taxable year shall be the lesser of the following:

(4) the tax for the taxable year computed with such deduction; or

(5) an amount equal to—

(A) the tax for the taxable year computed without such deduction, minus

(B) the decrease in tax under this chapter (or the corresponding provisions of prior revenue laws) for the prior taxable year (or years) which would result solely from the exclusion of such item (or portion thereof) from gross income for such prior taxable year (or years).

ment to Cardinal was not deductible. Respondent first argues that allowance of a deduction would frustrate the sharply defined public policy of the Commonwealth of Kentucky, because, according to respondent, petitioner's actions with respect to the registration of the contract stock violated the criminal provisions of the Kentucky Securities Act. Respondent cites *Tank Truck Rentals* v. *Commissioner*, 356 U.S. 30 (1958). Even if we agreed with respondent that petitioner had committed a crime—and the evidence establishes no more than that the Kentucky attorney general had argued that the Securities Act had been violated—we would not for that reason disallow the deduction, because the payment in question was not made on account of and was not directly related to any such violation. Rather, it was made in response to the claim by the department of insurance that the profits from the sale of contract stock rightfully belonged to Cardinal. *Tank Truck Rentals* v. *Commissioner, supra*, is clearly distinguishable, since the deductions there disallowed were payments of fines for violations of State law, and allowance of deductions would have diluted the intended penalties. See *Lawrence M. Marks*, 27 T.C. 464 (1956); Rev. Rul. 61–115, 1961–1 C.B. 46.

Respondent's argument that petitioner's payment was a nondeductible personal expense is based upon the assertion that, in making the payment, petitioner was motivated by a desire to avoid criminal prosecution for violation of the Securities Act. There is no support in the record for this assertion. On the contrary, the evidence strongly supports petitioner's testimony that he paid over the money because he feared lest further controversy over the matter damage his status and reputation with the insurance industry and hence endanger his professional career, which was closely tied to that industry. We have so found. Nor do we think petitioner was unreasonable in his belief. No more is required for petitioner's payment to Cardinal to be deductible as an ordinary and necessary business expense under section 162(a). *Lawrence M. Marks, supra;* Rev. Rul. 61–115, *supra;* see *Old Town Corporation*, 37 T.C. 845 (1962), acq. 1962–2 C.B. 5; *C. Doris H. Pepper*, 36 T.C. 886 (1961).

Respondent's second objection to granting relief under section 1341 is that it was not sufficiently "established," in 1958 or any other year, that petitioner "did not have an unrestricted right to" the profits from the sale of the contract stock. Sec. 1341(a)(2). Respondent urges that there must be a clear showing, under State statutes or decisions, of petitioner's liability to Cardinal, before section 1341(a)(2) can be satisfied. Certainly, a judicial determination of liability is not required. See Rev. Rul. 58–456, 1958–2 C.B. 415, 418. However, we believe that it is necessary under section 1341(a)(2) for a taxpayer to demonstrate at least the probable validity of the adverse claim to the funds repaid. This position is supported by Rev. Rul. 58–456, *supra*,

wherein the following language of the Court of Appeals for the Ninth Circuit is quoted with approval (*Crellin's Estate* v. *Commissioner*, 203 F. 2d 812 (C.A. 9, 1953), certiorari denied 346 U.S. 873, affirming 17 T.C. 781):

In short, for tax purposes, it is that which the holding company could have compelled, not that in which the stockholders were willing to acquiesce, which controls. Otherwise, the taxpayers in this case could "lift the federal tax-hand" to suit their convenience. * * *

Section 1341 was enacted to change the result reached in *United States* v. *Lewis*, 341 U.S. 590 (1951). See H. Rept. No. 1337, to accompany H.R. 8300 (Pub. L. 591), 83d Cong., 2d Sess., p. A294 (1954); *Estate of Samuel Stein*, 37 T.C. 945, 957 (1962). *Lewis* was a suit for refund of 1944 taxes paid on that part of an amount, received under claim of right as a bonus, which the taxpayer was required (under compulsion of a judgment) to restore in 1946. The Supreme Court held that no refund of the taxpayer's 1944 taxes was allowable. Consequently, the taxpayer was only entitled to a deduction in 1946, the year of the repayment.

We are of the opinion that, to become entitled to relief under section 1341, a taxpayer must prove by a preponderance of the evidence that he was not entitled to the unrestricted use of the amount received in the prior year. In other words (assuming that the Supreme Court had decided the *Lewis* case in taxpayer's favor) he must produce proof sufficient to have entitled him to an adjustment of the prior year's tax.

We do not believe that Congress intended to allow a credit based upon a recomputation of the prior year's tax in the absence of such a showing. This interpretation of the statute is supported by the use of the word "established" in section 1341(a)(2). For section 1341 to be applicable, it must be "*established* after the close of such prior taxable year (or years) that the taxpayer did not have an unrestricted right to such item." (Sec. 1341(a)(2). Emphasis supplied.) "Establish" means "to prove or make acceptable beyond a reasonable doubt." Webster's New International Dictionary (3d ed. 1961).

We are of the opinion that petitioner has not satisfied the requirements of section 1341(a)(2). Petitioner does not admit that he was not entitled to the profits he received in 1957. Indeed, he testified that he was not convinced the money belonged to Cardinal, though the formidable array of lawyers arguing the contrary raised some doubt in his mind. Petitioner was not compelled by legal process to make the payment. Finally, the record does not disclose the theory upon which Thurman and Wolford were basing their claim that the profits belonged to Cardinal; so we cannot say whether, under Kentucky law, such claim would have been upheld.

Petitioner relies upon *Wetstone* v. *United States*, an unreported case (D. Conn. 1960, 5 A.F.T.R. 2d 1486, 60–1 U.S.T.C. par. 9452),

for the proposition that he need not prove the probable validity of the regulatory authorities' claim. The *Wetstone* case involved a year to which section 1341 was not applicable; it did not purport to construe section 1341. Although the court's reasoning seems questionable, we need not decide whether the case is correct on its own facts. Suffice it to say that the rule laid down therein is incompatible with our interpretation of the purpose and the language of section 1341. See *Ernest H. Berger*, 37 T.C. 1026, 1032.

Petitioner has not proved that he was not entitled to retain the profits from the sale of Cardinal contract stock. Accordingly, he does not meet the requirements for relief under section 1341. As previously pointed out, however, a bona fide claim was asserted against him, there was serious uncertainty as to the validity of the claim, and the payment in satisfaction of the claim was made for valid business reasons. The payment was not voluntary, in the sense of being gratuitous. It follows, then, that the payment is deductible under section 162(a) as an ordinary and necessary business expense. *Lawrence M. Marks*, *supra*.[10]

*Decision will be entered under Rule 50.*

---

[10] In his petition and amended petition, petitioner claimed a net operating loss carryback from 1958 to 1957. Respondent's objection to this claim was based upon the theory that the 1958 payment to Cardinal was not a deduction attributable to petitioner's trade or business. See sec. 172(d)(4). In view of our decision herein, respondent's objection is not well founded.