SPA BUILDING CORPORATION, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
SPA Bldg. Corp. v. Commissioner
Docket No. 1600-72.
United States Tax Court
T.C. Memo 1974-37; 1974 Tax Ct. Memo LEXIS 282; 33 T.C.M. (CCH) 179; T.C.M. (RIA) 74037; February 7, 1974, Filed. E. Richard Criss, Jr., for the petitioner.
David L. Jordan, for the respondent. FEATHERSTON
MEMORANDUM FINDINGS OF FACT AND OPINION
FEATHERSTON, Judge: Respondent determined a deficiency in the amount of $7,362.69 in petitioner's income tax for the taxable year ended March 31, 1969. The only issue for decision is whether $14,000 received by petitioner on March 5, 1968, from The Spa Health and Beauty Resort of Lubbock, Texas, Inc., was prepaid rent, as contended by petitioner, or a loan, as determined by respondent. 2 FINDINGS OF FACT
At all times pertinent to this proceeding, petitioner was a Texas corporation with its principal office in Lubbock, Texas. On June 17, 1969, petitioner filed its corporate income tax return for the *283 taxable year ended March 31, 1969, with the Internal Revenue Service Center, Austin, Texas.
In 1967 Tom Kelley and Bill Dunham wanted to organize and operate a health spa in Lubbock, Texas. They had experience in that business but needed additional capital. They presented their ideas to a group of businessmen in Lubbock (sometimes hereinafter referred to as "the investors group"), and the investors group agreed to provide the needed financial backing. After studying the matter, Kelley, Dunham, and the investors group decided to organize two corporations - Spa Building Corporation (the petitioner) and The Spa Health and Beauty Resort of Lubbock, Texas, Inc. (sometimes hereinafter referred to as "Spa Health"). Petitioner was to acquire a lot, construct a building, and lease it for use in the venture, and Spa Health was to operate the health facility. Petitioner was to be controlled by the investors group and Spa Health by Kelley and Dunham. 3 All the class B stock and slightly more than one-half of the outstanding class A stock of Spa Health were owned by Kelley and Dunham; the rest of the class A stock was owned by the investors group. The common stock of petitioner was *284 owned equally by Kelley, Dunham, and each of the members of the investors group, except that four members of the investors group each owned only 50 shares while the rest of the members each owned 100 shares. The boards of directors and members of the executive committees of the two corporations were the same, and they held joint meetings.
By January 1, 1968, the health facilities had been constructed, and petitioner leased the premises to Spa Health for 18 months at a rental of $4,721.22 per month. The written lease contained no provision dealing with the prepayment of rent. On January 1, 1968, petitioner also entered into a written employment contract with Kelley and Dunham which provided, among other things, that until such time as $33,000 was paid to petitioner under the lease agreement, Kelley and Dunham would devote their full time and efforts to the management and operation of the health facility.
Prior to March of 1968, Kelley approached the majority stockholders of petitioner's with a proposal that 4 petitioner acquire a tract of land adjacent to the facilities just constructed and add a health facility which would be used exclusively be women. At the time this proposal *285 was made, petitioner did not have enough money to buy the land or construct the facility. Members of the investors group as individuals had guaranteed the mortgage note given for the construction of the building, and they did not want to incur any further debt for expanding the health facility. They wanted to wait until petitioner had funds on hand for this purpose. However, Spa Health had on hand the funds necessary for the land purchase, and it was agreed that Spa Health would prepay $14,000 of the rent on the building and that petitioner would then acquire the adjacent tract of land and construct the women's facility thereon.
Pursuant to the agreement, Spa Health issued its check in the amount of $14,000 to petitioner on March 5, 1968. This check was deposited in petitioner's general account. The face of the check bears two notations - "transfer funds for land," which Kelley had placed on the check when it was issued, and "prepaid rent." This latter notation was placed on the check by J. C. Armstrong, one of the stockholders and a certified public accountant, who supervised petitioner's books of account and prepared 5 its income tax return for the fiscal year ended March 31, 1968. *286 The deposit slip covering the transaction contains a notation "Prepaid Rent," which was placed thereon on or before June 15, 1968, the due date of the income tax return.
On March 7, 1968, petitioner purchased the lot for a consideration of $14,000.
At a joint meeting of the executive committees of Spa Health and petitioner on March 28, 1968, a discussion was held as to how the $14,000 payment to petitioner by Spa Health should be handled from an intercompany standpoint. James A. Walters, the attorney for the corporations, pointed out that Spa Health "had at the present time paid out a considerably larger sum than said corporation was required to pay under the terms of the lease contract between the two corporations." The following motion was adopted:
BE IT RESOLVED that The Spa Health and Beauty Resort of Lubbock, Texas, Inc., be and it is hereby required to continue to pay monthly the sum of $4,721.22 to Spa Building Corporation for a period of 18 months commencing January 1, 1968, notwithstanding the fact that at the present time a sum larger than is required by the lease agreement contract between the corporations dated January 1, 1968, has in fact been paid by The Spa Health *287 and Beauty Resort of Lubbock, Texas, Inc., directly or indirectly to or on behalf of Spa Building Corporation; and 6 BE IT FURTHER RESOLVED that, until the accounts between the corporations are adjusted and equalized, the excess payments made by The Spa Health and Beauty Resort of Lubbock, Texas, Inc. to or on behalf of Spa Building Corporation shall be deemed to be an unsecured loan by The Spa Health and Beauty Resort of Lubbock, Texas, Inc. to Spa Building Corporation and the monthly checks shall simply be marked "prepaid rental."
One of the employees of the accounting firm that set up petitioner's books for its first fiscal year recorded the $14,000 received in March in an account entitled "Prepaid Rent." When Armstrong (on or before June 15, 1968) checked that employee's work in preparation for filing petitioner's income tax return for the fiscal year ended March 31, 1968, he directed an adjusting entry to be made debiting the "Prepaid Rent" account and crediting the "Rent Income" account. Armstrong made this adjustment because he was of the opinion that petitioner, a cash basis taxpayer, was required to include the $14,000 payment in income in the year in which it was *288 received. The $14,000 was recorded on Spa Health's books of account as a rental expense. Spa Health's first fiscal year ended January 31, 1968.
On March 31, 1968, prior to the adjusting entry described above, the "Rent Income" account showed a 7 balance of $17,533.58, which figure is $3,369.92 more than the rent which was then due under the terms of the lease. In addition to prepaying rent, Spa Health also made cash advances to petitioner. As a result of these advances, petitioner's general ledger shows an account payable to Spa Health of $8,227.80 on March 31, 1968, and $12,715.17 on March 31, 1969.
In July 1968 Kelley and Dunham reported to the investors group that they had received bids for the construction of the additional facilities which exceeded by 50 percent the amount they had previously estimated. The investors group then expressed their desire not to incur further indebtedness for new construction at that cost. At a joint special meeting of the boards of directors and stockholders of both corporations held on July 9, 1968, various alternatives were discussed.
Finally, at a joint special meeting of the boards of directors and stockholders of the two corporations *289 on July 19, 1968, it was decided that petitioner would not construct the new facility. Instead, Spa Health would construct the facility, and petitioner would convey to Spa Health the lot acquired for this purpose in "cancellation of a portion of the indebtedness owing by Spa Building Corporation to The Spa Health and Beauty Resort." 8 Pursuant to that decision, the lot that had been acquired on March 7, 1968, was conveyed along with the adjoining lot to Spa Health on July 29, 1968. Petitioner's "Land" account was credited with $14,000 and its "Rental Income" account was debited in the same amount.
The women's health facility was subsequently constructed and operated by Spa Health, and sometime prior to March 12, 1970, Kelley and Dunham severed their relationship with petitioner.
As noted above, on its income tax return for the taxable year ended March 31, 1968, petitioner included the $14,000 as taxable gross rents. On its income tax return for the taxable year ended March 31, 1969, petitioner reported total income of $45,387.96, consisting entirely of gross rents. In the notice of deficiency, respondent determined that the $14,000 payment to petitioner was "a loan or deposit *290 rather than prepaid rent. Therefore the repayment by transfer of land is not deductible."
ULTIMATE FINDING OF FACT
The $14,000 received by petitioner from Spa Health on March 5, 1968, was prepaid rent. 9 OPINION
The issue presented for decision as set forth above is taken in substance from respondent's brief, and it accurately reflects the issue which was tried and briefed by the parties. Respondent has never contended in this proceeding that the conveyance of the lot to Spa Health, as a matter of law, did not give rise to a deduction under sections 162(a), 165, 212, 1341, or any other section of the Internal Revenue Code of 1954, as amended, in computing petitioner's income for the taxable year ended March 31, 1969. See United States v. Simon, 281 F.2d 520, 524-527 (C.A. 6, 1960); cf. Vincent E. Oswald, 49 T.C. 645, 647-649 (1968); Joseph P. Pike, 44 T.C. 787, 798-801 (1965). We do not know what kind of trial record petitioner would have made if the battle had been fought on that ground. Accordingly, we confine our consideration of the case to the purely factual issue as to whether the $14,000 received by petitioner from Spa Health *291 on March 5, 1968, was a loan or prepaid rent.
This type of issue is litigated with a fair degree of frequency, and the courts have enumerated and applied various criteria in deciding the issue at hand. See, e.g., United States v. Williams, 395 F.2d 508 (C.A. 5, 10 1968), and cases cited; Hirsch Improvement Co. v. Commissioner, 143 F.2d 912 (C.A. 2, 1944); and Blue Flame Gas Co., 54 T.C. 584 (1970). However, the controlling standards depend upon the factual context in which the problem is presented.
As an ultimate fact, we have found that the $14,000 advanced to petitioner by Spa Health was prepaid rent. In reaching that conclusion, we recognize that there is evidence in the record from which a contrary decision could be reached. We have been impelled to reach our conclusion, however, principally by the following factors.
First, the testimony of Armstrong and Walters, the respective accountant and attorney for the two corporations, was to the effect that the $14,000 payment was intended to be prepaid rent. See *292 Kohler-Campbell Corp. v. United States, 298 F.2d 911, 913 (C.A. 4, 1962). The testimony of Kelley, no longer connected with petitioner, is to the same effect. Further, members of the investors group had guaranteed some, if not all, of petitioner's indebtedness, and they were determined to avoid having petitioner incur further indebtedness. The testimony of all three of these witnesses as to intent is corroborated by other facts of the case. 11 Second, the bookkeeping records of petitioner indicate the transaction was prepaid rent. These records were supervised by Armstrong, a certified public accountant, who was responsible for the accounting for both corporations. He participated in the creation of both corporations, owned stock in both, and served on the boards of directors and executive committees. Thus, he was in a position to know the intended nature and character of the transaction. In those circumstances, these bookkeeping entries have substantial weight.
Third, the timing of Armstrong's directions to treat the item as prepaid rent on petitioner's books and income tax returns supports the bona fides of his instructions. Treating the $14,000 as a loan, *293 as urged by respondent, would have avoided including it in petitioner's taxable income for the period ended March 31, 1968. Prior to the due date for filing petitioner's income tax return, neither Armstrong nor the other corporate officers could have known that a "refund" of the $14,000 would be made. Also, the absence of proportionate ownership by the stockholders of the two corporations makes it unlikely that the item would have been reported as prepaid rent merely to support a deduction by Spa Health for its first taxable year which did not end until January 31, 1968. 12 Finally, the transaction was not handled as a loan. No note or other evidence of indebtedness was given by petitioner for the $14,000. No repayment date was set and this is "a fundamental characteristic of a loan." United States v. Williams, supra at 511. No interest was paid, and no security was given for the repayment of the money. See Blue Flame Gas Co., supra at 595. In addition, although all the individuals involved intended the $14,000 to be used to buy the lot for the building addition, no formal restrictions were placed on petitioner's use of the money, and *294 a payment received in advance without restrictions as to its use, for consideration to be subsequently furnished, is taxable in the year received. Schlude v. Commissioner, 372 U.S. 128 (1963). Protection of Spa Health's interests, if the transaction had been a loan, would have required some of these indicia of indebtedness.
Respondent emphasizes the language of the minutes of the meeting of March 28, 1968, quoted in our Findings, in which it was stated that "until the accounts between the corporations are adjusted and equalized, the excess payments" to petitioner "shall be deemed to be an unsecured loan" and "the monthly checks shall simply be marked "prepaid rental."" These minutes provide some support for 13 respondent, but they are ambiguous. The quoted language, coupled with the introductory statement that "notwithstanding the fact that at the present time a sum larger than is required by the lease agreement * * * has in fact been paid," suggests that the payments were actually regarded as rent when they were advanced. The testimony is that Armstrong, at the time he prepared the return, discussed these minutes with the attorney who drafted them, and on the basis *295 of that discussion Armstrong decided that the minutes were "probably adequate" since "they did convey the fact that it [the $14,000] was intended to be prepaid rent."
Respondent also emphasizes the fact that the monthly rental payment under the lease was $4,721.22 and that the $14,000 figure could not represent prepaid rental for any specified period. In United States v. Williams, 395 F.2d at 511, the Court of Appeals noted it was "quite damaging to taxpayer's position" that the payment exactly equaled the rent for 15 years. That a disputed payment exactly equals the rent payable for a given period, as in the Williams case, can be an important factor in showing that the payment was rent. But merely because a payment does not exactly equal the rent -o_ ,_g_v_n ;od _ ;ot sho_ t;a; payment was not was not rent, and we do not think 14 respondent,whose position ordinarily is contrary to the one taken here, [1] would have us so hold.
*296 Taking into account all the evidence, we hold the $14,000 was a prepayment of rent. If the tables were turned and respondent were contending that the $14,000 was taxable when received on March 5, 1968, his case would be almost impregnable. We think petitioner's position on the same issue should be no weaker.
To reflect concessions by petitioner on other issues, Decision will be entered under Rule 155. Footnotes
1. See, e.g., United States v. Williams, 395 F.2d 508 (C.A. 5, 1968); Kohler-Campbell Corp. v. United States, 298 F.2d 911 (C.A. 4, 1962); New Capital Hotel, Inc. v. Commissioner, 261 F.2d 437 (C.A. 6, 1958); Hirsch Improvement Co v. Commissioner, 143 F.2d 912 (C.A. 2, 1944); Astor Holding Co. v. Commissioner, 135 F.2d 47 (C.A. 5, 1943); and Blue Flame Gas Co., 54 T.C. 584↩ (1970).