Elmer W. Conti and June L. Conti v. Commissioner.
Conti v. Comm'r
Docket No. 3449-69.
United States Tax Court
T.C. Memo 1972-89; 1972 Tax Ct. Memo LEXIS 168; 31 T.C.M. (CCH) 348; T.C.M. (RIA) 72089; April 19, 1972, Filed James E. Brown, 100 W. Monroe, Chicago, Ill., for the petitioners. Nelson E. Shafer, for the respondent. TANNENWALD
*168 Memorandum Findings of Fact and Opinion TANNENWALD, Judge: Respondent determined deficiencies in petitioners' income tax and petitioners claim overpayments herein, as follows: *13 1962
1963
Over-
Over-
payment
payment
Deficiency
claimed
Deficiency
claimed
$195,727.46
$86,718.05
$4,799.48
$6,855.67 Several concessions having been made by the parties, the only issues remaining for decision are: 1. Whether petitioner Elmer W. Conti received the sum of $350,000 (or some lesser amount) in 1962 as payment for his oral agreement to put a group headed by one Lawrence Kahn in control of the *169 Leyden Savings and Loan Association. 2. Whether certain payments made by petitioner Elmer W. Conti in 1964 to the Leyden Savings and Loan Association qualify as business expenses deductible under section 162(a) [1] or give rise to business losses within the purview of section 165(c) (1) so as to produce a net operating loss carryback deduction in 1962 and/or 1963. Findings of Fact Some of the facts have been stipulated. The stipulations, *170 together with the exhibits attached thereto, are incorporated herein by this reference. Petitioners, husband and wife, resided in Illinois at the time of filing the petition herein. They filed joint Federal income tax returns with the district director of internal revenue, Chicago, Illinois, for each of the years in question. June L. Conti is a party to this proceeding only by reason of having joined in filing the returns involved and any reference herein to petitioner shall be deemed to refer to Elmer W. Conti. Starting in 1949 and continuing through the time of trial herein, petitioner has been actively involved, as an elective official, in state and/or local politics. During this period, he has held various positions, both salaried and unsalaried, including: Village Trustee, Village of Elmwood Park, Illinois; President, Village of Elmwood Park, Illinois Republican Township Committeeman, Leyden Township, Illinois; and State Representative, State of Illinois. Also during this period, petitioner was engaged in the following additional trades or businesses: real estate land development, including the construction of both residential and commercial buildings; insurance; and being *171 an officer-employee of a savings and loan institution. Petitioner's income from the foregoing activities was as follows: 1959
$ 9,713.05
1960
10,528.08
1961
13,104.66
1962
32,968.27
1963
23,301.64
In 1954, petitioner took the lead in organizing the Leyden Savings and Loan 349 Association (hereinafter referred to as Leyden), a mutual association, in the Village of Franklin Park, Illinois. The managerial structure of Leyden was comparable to that of the ordinary corporation, i. e., shareholders (depositors) elected a board of directors, who, in turn, chose the managing officers. The shareholders were customarily requested to sign proxy cards to bee used for the election of directors at the annual members' meeting. Prior to November 2, 1962, proxies were solicited in the names of petitioner and his wife. Petitioner encountered little difficulty in obtaining these proxies and usually possessed about 95 percent of them in his name. From the time of Leyden's inception and up until 1966, petitioner was its president and one of its directors, with the exception of the period November 8, 1962 to May 1, 1963, when he did not serve as a director, although he continued *172 as president. Scott-Grand Building Corporation (hereinafter referred to as Scott-Grand) was incorporated on March 3, 1954 and dissolved on November 12, 1964. At all times pertinent, petitioner was its sole stockholder. On or about June 1, 1960, Scott-Grand (lessor) and Leyden (lessee) entered into an agreement with respect to property at 10001 West Grand Avenue, Franklin Park, Illinois, where Leyden conducted its savings and loan business. Said lease was executed by petitioner on behalf of each party and contained the following provision: If at any time during the term of this lease the Lessor shall desire to sell the building in which the demised premises are located, the Lessee shall have the right to purchase said property at a price to be determined upon a current appraisal made by an independent appraiser acceptable to both parties. Sometime in August or September 1962, petitioner was contacted by one Nicholas Gallo. Gallo told petitioner that he had a client who was interested in purchasing some real estate in Franklin Park to be used for a financial institution and that said client wanted to know if petitioner was interested in selling his (the Scott-Grand) building. *173 After a second meeting between petitioner and Gallo, arrangements were made for petitioner to meet with one Lawrence Kahn (hereinafter Kahn) sometime in October 1962. Kahn and petitioner had several meetings in or about October 1962, during which they discussed both the possible sale of the building housing Leyden and the transfer of the control of Leyden. During the period when negotiations were taking place, petitioner caused a character and financial check to be made of Kahn. As a result of these negotiations, an aggregate purchase price of $450,000 was agreed upon and it was also decided that the entire deal should be cast in the form of a real estate transaction because of the dubious legality of buying and/or selling proxy cards to gain control of a mutual association. To this end, the Kahn group formed the Sandy Building Corporation (hereinafter Sandy) in the latter part of October 1962 to serve as the vehicle for the acquisition of the property from Scott-Grand. Petitioner and Kahn, as well as other persons who participated in the transaction, understood that control of Leyden was an essential part of the bargain and that petitioner would take the appropriate action to effectuate *174 the exercise of such control by Kahn and his group. On the morning of November 2, 1962, Sandy's shareholders and directors passed a resolution authorizing the purchase of the following: the real estate located at, and commonly known as, 10001 West Grand Avenue, Franklin Park, Illinois, including the control of the operation and management of the Leyden Savings and Loan Association * * * for the sum of Four Hundred Fifty Thousand and No/100 Dollars ($450,000.00) * * *. Later, on November 2, 1962, petitioner and his attorney, Leslie J. Smith (hereinafter Smith), met with Kahn, Arthur Sachs (attorney for Sandy and Kahn, hereinafter Sachs), M. Prial Curran (attorney employed by Sachs, hereinafter Curran), and others at the office of the Midwest Bank & Trust Company (hereinafter Midwest Bank), to consummate the above-described deal. Various documents prepared by Sachs and/or Curran were presented at that time, including a real estate sale contract, a proposed escrow agreement, and deeds of conveyance. The transaction, as originally planned, was to be consummated through an escrow agreement, with Midwest Bank acting as escrowee. At the meeting on November 2, 1962, petitioner executed *175 various documents referring to an escrow, including the real estate sale contract, which provided that "this sale shall be consummated pursuant to said escrow." The real estate sale 350 contract executed by Scott-Grand and Sandy at said meeting made no mention of control of Leyden. At the same time, petitioner and Curran (on behalf of Sandy) executed a document supplementary to the proposed escrow agreement, which provided that Smith and Sachs were to direct Midwest Bank to pay out the proceeds of the escrow when the following occurred: When duly executed proxies in form and content and nominating individuals acceptable to ARTHUR B. SACHS covering the vote of not less than seventy-five (75%) per cent of the total eligible votes of depositors, or shareholders, of the LEYDEN SAVINGS AND LOAN ASSOCIATION * * * have been received. A last-minute refusal by Midwest Bank to act as escrowee necessitated the immediate making of alternative arrangements. To this end, Smith and Curran forthwith improvised and executed an agreement which provided that they would comply with the terms set forth in the proposed escrow agreement dated November 2, 1962. As part of the transaction, petitioner *176 and Smith each signed and delivered, during the closing on November 2, 1962, an inducement which provided as follows: As an inducement to the purchaser of the building and real estate where the LEYDEN SAVINGS AND LOAN ASSOCIATION is located, commonly known as 10001 West Grand Avenue, Franklin Park, Illinois, to purchase said property and interests therein, the undersigned hereby certifies and warrants that (a) he has no claim of any nature against LEYDEN SAVINGS AND LOAN ASSOCIATION, or SCOTT-GRAND BUILDING CORPORATION other than any current compensation, if any, due for services; (b) has no knowledge of any possible claim of any nature against the said Association or SCOTT-GRAND BUILDING CORPORATION not reflected in the books and records of the respective organizations and the financial report submitted to said purchaser; and (c) he will not undertake, directly or indirectly, through any means to alter or change the nominees named in the proxies for voting shares of LEYDEN SAVINGS AND LOAN ASSOCIATION delivered to the purchaser pursuant to the escrow covering said sale without the express approval of the purchaser, nor do any act to hinder or jeopardize the use of said proxies.
*177 At no time prior to the sale by Scott-Grand to Sandy was Leyden's board of directors given the opportunity to consider the possibility of exercising its option to purchase under the lease with Scott-Grand. On or about November 2, 1962, Scott-Grand executed a warranty deed (re "Parcel #1") and a quit-claim deed (re "Parcel #2"), conveying the real estate at 10001 West Grand Avenue, Franklin Park, Illinois, to Sandy; said deeds were duly recorded in the office of recorder of deeds, Cook County, Illinois, on November 5, 1962. The aforementioned Parcel #1 contained land improved with a building, and Parcel #2 contained a parking facility that was used as an appurtenance to and as part of Parcel #1. In addition, Scott-Grand assigned its interest in the lease with Leyden to Sandy and conducted no business thereafter. An appraisal of the hereinbefore described real estate, made at the request of the Federal Deposit Insurance Corporation (FDIC), indicated a value of approximately $95,000 on February 21, 1964. In November 1962, the value of said real estate was not more than $100,000. Also on or about November 2, 1962, $450,000 furnished by or on behalf of Sandy and/or Kahn was deposited *178 with Midwest Bank and credited to the following new checking accounts at said bank pursuant to a "Direction" signed by petitioner, Kahn, and Curran: Account No.
Amount
Account of
XX4-434
$350,000
Scott-Grand Building Corporation
XX2-432
100,000
Leslie Smith & M. Prial Curran Sachs and Curran acceded to petitioner's urgent request for the immediate distribution of $350,000 to Scott-Grand upon petitioner's and Smith's assurances that they would have the resignations of a majority of the directors within a few days and that the money would not be spent prior thereto. Midwest Bank checking account no. XX4-434 was closed by a transfer of funds to the following accounts controlled by petitioners at Midwest Bank: Date
Amount
No.
Account name
11/8/62
$280,000
X0103
Elmer or June Conti Investment Account
11/8/62
50,000
XX0-794
June Building Fund (June Conti)
11/8/62
10,000
XX9-285
Elmer Conti, Personal
11/8/62 10,000
XX2-160
June Conti, Personal
$350,000 351 Funds in Midwest Bank checking account no. XX2-432 were disbursed as follows: $ 41,729.28
To purchase Midwest Bank cashier's check no. 11572, dated November 24, 1962, payable to Bank of Broadway, Melrose Park, Illinois, to cancel and release outstanding trust deed (mortgage) dated March 25, 1962 against Scott-Grand.
3,330.85 -
To Purchase Midwest Bank cashier's check no. 13200, dated March 14, 1963, payable to Sandy.
54,939.87
Transferred on or about March 14, 1963 to Investment Account of Elmer W. or June Conti (account no. X0103) at Midwest Bank.
$100,000.00
*179 By the time of the closing, petitioner knew that he could obtain the resignations of at least three of Leyden's five existing directors, viz., his own, Smith's and that of one Richard Melone. Shortly thereafter, on November 8, 1962, four of the existing directors resigned and were replaced by nominees of Kahn. Also at about that time, a letter was sent out to solicit new proxies in the names of Elmer W. Conti, M. Prial Curran, or Henrietta L. Keating; solicitation of proxies in that style continued at least until September 1963. Curran and Henrietta L. Keating were members of the Kahn group. The minutes of Leyden reflect that, during the years 1962 and 1963, the following persons were acting as directors of said association: On and before
Nov. 8, 1962 to
May 1, 1963
On and before
Nov. 8, 1962 to
May 1, 1963 to
On and after
Nov. 8, 1962
May 1, 1963
Sept. 4, 1963
Sept. 4, 1963
Elmer W. Conti
Victor Born *
Elmer W. Conti
Elmer W. Conti
William Eunson
William Eunson
William Eunson
William Eunson
Dwight Guyer
M. Prial Curran *
M. Prial Curran *
June Conti
Leslie J. Smith
Jerome Kritchevsky *
Jerome Kritchevsky *
Genevieve Stanko
Richard Melone
Henrietta L. Keating *
Henrietta L. Keating *
Dorothy Gray
*180 Sometime in early January 1963, petitioner went to Florida for an extended vacation. In early February of that year, William Eunson (hereinafter Eunson), an officer of Leyden, upon returning to his job after an illness of some two weeks, learned that during his absence Leyden had purchased several bad loans from Chatham Bank, which was controlled by Kahn, and made loans to Kahn or to corporations controlled by him, with insufficient security. One such transaction occurred on January 23, 1963, when Leyden issued two checks to Sachs payable to Chatham Bank for the account of two corporations owned or controlled by Kahn. One checks, in the amount of $375,000, was ostensibly issued for mortgage loan no. 597, and the second, in the amount of $616,900, for loan No. 598. At no time did Leyden ever have in its possession any applications, mortgages, notes, or other documents supporting said purported loans. Eunson contacted petitioner in Florida and told him that Leyden's financial position had been impaired by the existence of said loans. Petitioner returned to Illinois sometime in the early part of February 1963 and, with the assistance of Eunson, *181 through persistent demands upon Kahn and Sachs, obtained full repayment of loan No. 598 in the principal amount of $616,900 and collected the sum of $200,000 on loan No. 597, leaving a balance due on the latter loan in the amount of $175,000. Further inquiries made by petitioner and Eunson revealed that on November 27, 1962 Leyden had purchased from Chatham Bank a mortgage for $428,800 (loan No. 553) on approximately 45 acres of vacant land in Berrien County, Michigan, and identified as Outlot "B." The amount of the loan was far in excess of the then value of the property. In June or July 1963, petitioner and Eunson notified the Director of Financial Institutions of the State of Illinois and the Federal Home Loan Bank Board (FHLBB) of the irregularties existing at Leyden. Thereafter, a joint audit conducted by the State and Federal agencies revealed that Leyden's financial structure was significantly impaired. On October 4, 1963, petitioner told FBI Special Agent John Lemmler that, when the Leyden premises were sold by Scott-Grand, control of Leyden was also sold by permitting Kahn to appoint three of the five directors of the association. On December 6, 1963, petitioner told *182 Albion Fenderson (then a trial attorney on the staff of the General Counsel of the FHLBB) that control of Leyden was sold to the Kahn group through the vehicle of a sale of the office building owned by Scott-Grand for an amount considerably in 352 excess of the true worth of the building. Furthermore, petitioner gave the following testimony in a criminal trial against Kahn, Curran, and Sachs: Q. So that as the deal was finally made in November, it was a deal for both the building and the proxies. A. Yes. On or about February 11, 1964, Joseph E. Knight, Director of Financial Institutions of the State of Illinois, took custody of Leyden, ordered Paul M. Miller appointed custodian as his representative, and issued his formal notice of taking custody (which notice also suspended withdrawals of all accounts in whole or in part for 30 days). This notice was posted on Leyden's doors and Leyden was closed on February 11, 1964. On February 18, 1964, in a letter to the Director of Financial Institutions of the State of Illinois, the FHLBB stated that Leyden had engaged in specified unsafe or unsound practices in violation of applicable laws and regulations. Said letter included an *183 allegation that the sale of the Leyden premises by Scott-Grand to Sandy also encompassed an undertaking by petitioner to deliver control of Leyden to the Kahn group. Said letter also indicated that, unless satisfactory corrective measures were taken within 120 days, it would make its determination relative to terminating Leyden's status as an insured institution. Knight then advised petitioner that Leyden could not be reopened until petitioner made peace with the Federal authorities. Sometime in the latter part of February 1964, petitioner told his attorney, Smith, that if Leyden was not reopened he (petitioner) would never be able to run for public office with any degree of success, would never be able to make any construction loans, and would be absolutely through. By letter dated March 16, 1964, petitioner, although disclaiming any responsibility for Leyden's difficulties, voluntarily made certain proposals to the State and Federal authorities - in a sincere effort to try to preserve for the community a respected institution * * * to place that association on a sound basis, and in order to try to avoid a situation whereby the Federal Savings and Loan Insurance Corporation *184 might possibly suffer some loss * * *. Said offer was conditioned upon, inter alia, withdrawal of the February 18, 1964, 120-day letter or receipt of assurances that no further action would be taken against petitioner or Leyden with respect to any of the matters set forth therein until petitioner and Leyden had been given a reasonable period of time within which to reach a satisfactory solution to any open issues. On or about March 26, 1964, in accordance with proposals which he had made in the March 16 letter, petitioner entered into a written Memorandum of Understanding with John A. O'Brien, Assistant Director of the Federal Savings and Loan Insurance Corporation (FSLIC) which, in substance, provided, inter alia, as follows: (a) A program was agreed upon whereby the failure of Leyden would be prevented and the practices and violations set forth in the letter from the Federal Home Loan Bank Board, dated February 18, 1964, corrected in a manner satisfactory to the Director and the Board and the association restored to private management and normal operations; (b) petitioner would deliver to Leyden his certified check in an amount equal to the sum of the accrued interest due on loan *185 No. 553 (estimated to be approximately $23,000) and the amount found necessary to permit Leyden to pay a 4 1/2% dividend for the period ending March 31, 1964; (c) petitioner would deliver, in escrow, to one Edwin A. Wahlen a certified or bank cashier's check payable to Leyden in the amount of $428,800, being the unpaid principal on loan No. 553, which amount would be not less than the profit, if any, made on the prior sale of the office building occupied by Leyden; (d) petitioner would also deliver, in escrow, to Wahlen a binding written guaranty wherein he would agree to pay to Leyden any amount Leyden failed to recover from the bonding company in full settlement of its existing $175,000 claim under its fidelity bond for losses on the transactions designated as loans No. 597 and No. 598; and (e) Leyden would convey title to the property securing loan No. 553 to petitioner. On March 26, 1964, the FHLBB approved the program reflected in the Memorandum of Understanding. On March 28, 1964, Leyden's directors approved said action, and, on March 30, 1964, the Director of Financial Institutions of the State of Illinois concurred therein. 353 In accordance with the foregoing, on March 30, 1964, petitioner *186 paid to Leyden the sum of $46,200.00, representing $25,178.48 interest on loan No. 553 and $21,021.52 estimated to be required for dividends payable by Leyden, and delivered to Wahlen a cashier's check in the amount of $428,800 payable to Leyden, together with his written guaranty covering the $175,000 claim. Said check and written guaranty were delivered by Wahlen to Leyden on May 5, 1964. Leyden was returned to the custody of its directors and reopened for business on March 31, 1964. Its operations were continued until the latter part of 1966, at which time it was merged into Community Savings and Loan Association pursuant to the direction of vote of Leyden's directors. Petitioners continued as president of Leyden throughout said period. In September 1964, Leyden encountered difficulty in collecting on various loans which it had purchased from Chatham Bank, and its financial structure was again impaired to the point that the semi-annual dividends due on September 30, 1964 could not be paid. On or about September 30, 1964, petitioner paid to Leyden the amount of $65,230 to make up the projected deficiency in the semi-annual dividend and thereby prevent a default. Of this payment, *187 the sum of $1,765.11 was returned to petitioner. Petitioner received title to the property securing loan No. 553, known as Outlot "B," from Leyden, as agreed in the March 26, 1964 Memorandum of Understanding. Being in need of funds, he obtained a mortgage on said property in the original amount of $40,000 from River Forest State Bank. Of the proceeds of this mortgage, petitioner received only the sum of $20,000, the balance being retained by the bank until its appraisal was completed. Upon receipt of the appraisal, the bank reimbursed itself for the $20,000 withheld, which had the effect of reducing the mortgage to $20,000. An independent appraiser selected by the FHLBB had appraised this property, as of September 6, 1963, at a value of $68,000. The fair market value of said property was $50,000 when received by petitioner in 1964. Most of the amounts paid by petitioner to Leyden in 1964 were generated by interest-bearing loans from various sources. Petitioner was 43 years of age at that time. Petitioner never received any promissory notes or other evidence of indebtedness from Leyden in connection with the aforementioned payments and had no expectation of being repaid, with the *188 exception of what he could realize from Outlot "B." At the time of trial herein, petitioner was being sued by Leyden and the FSLIC in the Circuit Court of Cook County, Illinois, relative to the personal guaranty he gave Leyden on the $175,000 balance outstanding on loan No. 597. The complaint filed by the FSLIC in the aforementioned case included the following allegations: COUNT II * * * 6. In March 1963, defendant, having learned of the aforesaid dissipation of Leyden's assets and knowing that his reputation and standing in the community would be greatly damaged if the situation created thereby were to become publicly known, resumed the duties as president of Leyden which he had abandoned in November 1962, as aforesaid, and defendant resumed active participation in the affairs of Leyden. * * * 7. For the purpose of so preserving his reputation, defendant, on March 24, 1964, entered into a certain agreement with plaintiff, FSLIC, entitled "Memorandum of Understanding," * * * in order to induce the plaintiff to continue Leyden's status as an insured association and to prevent governmental authority from closing down the operations of Leyden. * * * The answer and counterclaim *189 executed and filed by petitioner with respect to the foregoing complaint contained the following responsive and additional allegations: COUNT II * * * 6. Defendant admits the resumption of active participation in the affairs of Leyden Savings & Loan, but denies that such resumption was motivated by concern for a reputation and standing in the community * * *. Defendant further states that his resumption of these duties was motivated by a concern for the depositors of this association and at no time was defendant concerned about the possibility that any of the matters might become publicly known. 7. Defendant admits the execution of [the "Memorandum of Understanding"] * * * but states that such documents speak for themselves and denies any interpretation, conclusion or explanation offered by plaintiffs in its paragraph 7; defendant further denies plaintiffs conclusions and conjecture as to defendant's 354 motivation in executing any of these documents. * * * IV * * * 1. Despite the failure of consideration asserted in the First Defense hereto and the fact that defendant was under no legal obligation to pay these sums, defendant has by virtue of monies expended to protect *190 the shareholders of Leyden Savings & Loan Association, paid to said association and plaintiffs an amount far in excess of the sum prayed for by plaintiffs. * * * V COUNTER CLAIM * * * II * * * 6. Pursuant to defendant's desire to protect the depositors, * * * the following payments [2] were made by the defendant as an individual to Leyden Savings & Loan Association and for the benefit of the plaintiff herein. * * * In the course of interrogatories in said case, petitioner was asked and answered as follows: Q. State whether Defendant paid Leyden Savings and Loan Association the sums set forth in paragraph 6, of the second counterclaim, * * * to FSLIC's complaint. A. Yes. Same being done in an effort to protect the shareholders of Leyden. Ultimate Findings of Fact Petitioner, using Scott-Grand as a conduit, received the sum of $350,000 in 1962 as payment for his agreement to put the Kahn group in control of Leyden. Net payments in the amount of $488,464.89 made by petitioner in 1964 were reasonably *191 intended to preserve and protect his reputation in order to enable him to continue to carry on his business activities and were not akin to amounts expended for the creation of good will. Opinion The first issue involved herein presents a pure question of fact - did petitioner receive in 1962, through Scott-Grand, the sum of $350,000 as payment for his promise to put the Kahn group in control of Leyden? As our ultimate findings of fact reveal, we agree with respondent that this question should be answered in the affirmative. Our conclusion is based upon our analysis and evaluation of the record as a whole; we have set forth in our findings of fact those subsidiary factual elements which we deem necessary for an understanding of that conclusion. It is obvious to us that Kahn was interested in acquiring both control of Leyden and its physical premises. To this end, he offered petitioner $450,000, a sum far in excess of even the most optimistic appraisal of the premises' value appearing in the record herein. Although the contract of sale makes no reference to the contemplated transfer of control, a circumstance readily understood in light of the doubtful legality of any such provision, *192 the Kahn group was, in fact, with petitioner's valuable assistance, put in control of Leyden shortly after the "real estate sale contract" was consummated. In addition, the record is replete with evidence of subsequent statements by petitioner himself that transfer of control was an integral part of the transaction in question, statements which clearly belie his assertion herein that the transaction in question was solely a sale by Scott-Grand of its real estate followed by a distribution of $350,000 to petitioner in partial liquidation of the corporation. Moreover, we note that, as an inducement to the purchase of the real estate by Sandy from Scott-Grand, petitioner made warranties with respect to existing claims against Leyden, which was not a party to the sale, a highly unusual circumstance, to say the least. In short, the great weight of the evidence presented leads inescapably to the conclusion that the November 2, 1962 transaction was, in substance, both a sale by Scott-Grand of the physical premises, which Leyden occupied, and an agreement by petitioner to utilize his position to assure control of Leyden by the Kahn group, with Scott-Grand merely serving as a conduit for *193 the payment for that purpose. Petitioner's assertion that there was not a "sale" of the proxies themselves is totally beside the point. It is enough that the parties, including petitioner, understood that certain services would be performed 355 by him and that the transaction included a quid pro quo. To conclude otherwise would be to exalt form over substance. Cf. Commissioner v. P.G. Lake, Inc., 356 U.S. 260 (1958); Commissioner v. Court Holding Co., 324 U.S. 331 (1945); Griffiths v. Commissioner, 308 U.S. 355 (1939); Gregory v. Helvering, 293 U.S. 465 (1935); Herman Glazer, 44 T.C. 541 (1965). [3] It is equally clear to us, on the basis of the evidence presented, that $350,000 was paid to and received by petitioner for those services in 1962 and that $100,000 was the purchase price of the physical premises. [4] Accordingly, we hold that the sum of $350,000 received by petitioners in 1962 constitutes ordinary income to petitioners under section 61. *194 The other issue for decision is whether certain payments made by petitioner to Leyden in 1964 qualify as ordinary and necessary business expenses deductible under section 162(a) [5] or give rise to business losses within the purview of section 165(c) (1). [6] As we indicated in our ultimate findings of fact, the net amount of said payments was $488,464.89. [7] Respondent, relying on Welch v. Helvering, 290 U.S. 111 (1933), and several of its progeny, asserts that these payments were voluntarily made by petitioner simply for the purpose of protecting the depositors of Leyden and to insulate petitioner from the consequences of his own misdeeds, and that consequently they should be considered nondeductible personal expenditures of a capital nature. Petitioner, on the other hand, insists that the expenditures were made to protect and preserve his then existing business activities and his earning capacity flowing therefrom. [8] As our ultimate findings of fact show, we agree with petitioner.
*195 Our task herein is essentially one of drawing a line between expenditures to preserve and protect business reputation and those which improve and develop good will. The Supreme Court, in deciding against the taxpayer in Welch v. Helvering, supra, recognized that - [many] cases in the federal courts deal with phases of the problem presented in the case at bar. To attempt to harmonize them would be a futile task. They involve the appreciation of particular situations, at times with borderline conclusions. Compare James L. Lohrke, 48 T.C. 679 (1967). Clearly the fact that the payment was "voluntarily" made does not automatically deprive petitioner of the claimed deduction. C. Doris H. Pepper, 36 T.C. 886, 895 (1961). This is particularly true where, as is the case herein, there were overtones of a potential liability of petitioner to Leyden and its shareholders (depositors) with respect to the excessive payments received by him via Scott-Grand purportedly for the real estate and with respect to his responsibility, as president of Leyden, for the mismanagement of its affairs. Cf. James E. Anderson, 56 T.C. 1370 (1971), on appeal *196 (C.A. 7, Dec. 23, 1971); William L. Butler, 17 T.C. 675 (1951); Great Island Holding Corporation, 5 T.C. 150 (1945). There is no need for us to delve into the precise 356 nature of petitioner's potential liability - penal, punitive, or civil; nor does it appear that the allowance of the claimed deduction would clearly frustrate a well-defined public policy. Cf. Laurence M. Marks, 27 T.C. 464, 468 (1956); William L. Butler, supra, 17 T.C. at 680. See also commissioner v. Tellier, 383 U.S. 687 (1966). Respondent places great emphasis on the fact that petitioner, on several occasions, stated that his purpose in making the payments was to protect the shareholders (depositors) of Leyden, drawing the conclusion that such payments were not made to protect and preserve petitioner's business standing. We think that respondent's view of the situation is myopic. The protection of Leyden's shareholders (depositors) was an integral part of the process designed to achieve petitioner's own goal. Had Leyden failed because of the mismanagement of its affairs or had it come to light that petitioner had obtained payment for his agreement *197 to put the Kahn group into control of Leyden, the obvious consequence would have been severe damage or total destruction of petitioner's business reputation. That reputation and the welfare of the shareholders (depositors) were two sides of the same coin. We are likewise unimpressed with respondent's attempt to characterize the payments as capital in nature because the claimed benefits would inure to petitioner beyond the taxable year. Concededly, such benefits often have an effect over a substantial period of time. But, the key question is whether such effect is the prime purpose of the payment, i.e., the creation of good will, or whether it is incidental to a primary purpose to protect and preserve an existing asset or advantage, such as we believe was the case herein. The concept of capitalization, which respondent seeks to sustain, is present in cases where current deductibility has been permitted for advertising expenditures and expenditures to improve one's skills utilized in existing employment, even though there were indications that some general benefit would in all probability last beyond the year of expenditure. E. g., Consolidated Apparel Co., 17 T.C. 1570, 1582 (1952), *198 affirmed in part and reversed in part on other issues, 207 F. 2d 580 (C.A. 7, 1953) (advertising expenses); Cosimo A. Carlucci, 37 T.C. 695, 701 (1962) (educational expenses). Compare Harold Haft, 40 T.C. 2 (1963). Similarly, we reject respondent's attempt to posit a denial of the deduction on the ground that the payments were made to protect petitioner's reputation as an elective official and therefore precluded under McDonald v. Commissioner, 323 U.S. 57 (1944), and its progeny. Aside from any question as to the extent to which McDonald has current applicability (see James B. Carey, 56 T.C. 477 (1971), on appeal (C.A. 4, Oct. 15, 1971)), we think that the instant case is factually distinguishable and that there are no comparable overriding considerations of public policy involved herein. The expenditures were not campaign expenses, there is no indication that petitioner was running for office in 1964 and respondent makes no claim that he was, and petitioner's elective position was inextricably interwoven with his other business activities. Finally, respondent asserts that the deduction is unreasonable in amount *199 because it is unduly large when compared with the historical amount of "business income" that petitioner had previously enjoyed or might be expected to enjoy. But mathematical correlation in measuring the amount of a payment with the financial benefit to be derived has never been the touchstone for decision in situations of this kind. Cf. James E. Anderson, supra, 56 T.C. at 1374, n. 3; William L. Mitchell, 52 T.C. 170, 176 (1969), reversed on other grounds, 428 F. 2d 259 (C.A. 6, 1970); Joseph P. Pike, 44 T.C. 787, 799 (1965). Moreover, we note that, at least to the extent of $350,000, there was a precise measurement of petitioner's potential liability, to which, of course, must be added an indeterminable amount representing the potential liability for damages due to the mismanagement arising from large and substantially excessive loans made by Leyden. In short, on the basis of the entire record herein, we hold that petitioner's expenditure of $488,464.89 in 1964 was proximately related to his business activities and was made to preserve and protect his business reputation in order to enable him to continue to carry on such activities. *200 James E. Anderson, supra; William L. Mitchell, supra; Laurence M. Marks, supra; C. Doris H. Pepper, supra; Paul Draper, 26 T.C. 201 (1956). Consequently, he is 357 entitled to a deduction in that amount under section 162(a). In view of our conclusion, we do not reach petitioner's argument based upon section 165(c)(1). [9]
Decision will be entered under Rule 50. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.↩
*. Nominee of Lawrence Kahn.↩
2. The amounts referred to above include the previously described payments relating to loan No. 553 as well as amounts paid to enable Leyde to pay regular dividends.↩
3. In Chisholm v. Commissioner, 79 F. 2d 14, 15 (C.A. 2, 1935), the court stated: The question always is whether the transaction under scrutiny is in fact what it appears to be in form; a marriage may be a joke; a contract may be intended only to deceive others; an agreement may have a collateral defeasance. In such cases the transaction as a whole is different from its appearance. ↩
4. In this connection, we note that, of the total payment of $450,000, the sum of $100,000 was retained under the control of the Kahn group until a complete title search and the customary prorations were made and that, largely because of an outstanding mortgage, petitioners did not receive the full $100,000. Petitioners have conceded the correctness of respondent's determination that they realized long-term capital gain of $51,598.39 in 1963 from the distribution of such balance.↩
5. SEC. 162. TRADE OR BUSINESS EXPENSES. (a) In General. - There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, * * * ↩
6. SEC. 165. LOSSES. (a) General Rule. - There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise. * * * (c) Limitation on Losses of Individuals. -in the case of an individual, the deduction under subsection (a) shall be limited to - (1) losses incurred in a trade or business; ↩
7. Said amount is computed as follows: ↩
March 30, 1964 payments
$428,800.00
46,200.00
September 30, 1964 payment
65,230.00
(Less refund)
(1,765.11)
(Less fair market value of Outlot "B" when received by petitioner (50,000.00)
Net payments
$488,464.89
8. Respondent concedes that, if petitioner is entitled to the claimed deduction under section 162(a), he may carry back any net operating loss flowing therefrom.↩
9. We also note that petitioner on brief abandoned his original claim that section 1341 applies. See Kappel v. United States, 437 F. 2d 1222 (C.A. 3, 1971); Joseph P. Pike, 44 T.C. 787↩ (1965).